MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions

Decision:    2018 ME 85
Docket:      Ken-16-503
Argued:      May 12, 2017
Decided:     July 3, 2018
Revised:     July 17, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:    SAUFLEY, C.J., and ALEXANDER, MEAD, and HUMPHREY, JJ.
Dissent:     GORMAN, J., with whom JABAR, J., joins, and HJELM, J., joins in part.
Dissent:     JABAR, J.
Dissent:     HJELM, J.

## STATE OF MAINE

v.

## LYANNE LEMEUNIER-FITZGERALD

SAUFLEY, C.J.

[¶1]  This appeal requires us to determine whether evidence obtained from a warrantless blood-alcohol test, taken upon probable cause to believe that a driver's ability to operate a motor vehicle was impaired by intoxicants, falls within the consent exception to the warrant requirement if the suspect agrees to the blood draw following the standard explanation of the implied consent warnings.  In this evolving area of Fourth Amendment jurisprudence,

2

we conclude that the operator consented to the blood test, and we affirm the denial of the motion to suppress.[1]

## I. BACKGROUND

[¶2]   Lyanne LeMeunier-Fitzgerald appeals from a judgment of conviction entered by the trial court (Kennebec County, *Mullen, J.*) upon her conditional guilty plea to charges of operating under the influence (Class C), 29-A M.R.S. § 2411(1-A)(B)(2), (5)(C) (2017), and operating beyond a license condition or restriction (Class E), 29-A M.R.S. § 1251(1)(B) (2017), entered after the court (*Marden, J.*) denied her motion to suppress the results of a blood test for alcohol.  She challenges the court's determination that she voluntarily consented to the blood test after she was warned by the arresting officer that there were potential consequences if she refused to consent.

[¶3]  The operative facts, most of which were found upon the parties' stipulation and none of which are disputed on appeal, are as follows.  On December 21, 2015, an Augusta police officer suspected that LeMeunier-Fitzgerald was operating under the influence of an intoxicant after observing her in a supermarket parking lot.  Her vehicle was partially pulled

---

[1] Because we conclude that the court properly denied LeMeunier-Fitzgerald's motion to suppress, we do not reach the State's argument that suppression of the test results was not required because the officer was acting in "good faith reliance on existing law."

out of a parking space, her eyes were glassy, and she smelled of alcohol. When the officer approached and questioned her, she grabbed a bottle of pills and poured them into her mouth. The officer placed her in handcuffs and called for a rescue team. When the rescue team arrived, the handcuffs were removed and LeMeunier-Fitzgerald was taken to the hospital.

[¶4] After hospital personnel had attended to LeMeunier-Fitzgerald and had placed her in a room, the officer met with her. The officer informed her that he suspected that she had been attempting to operate a motor vehicle while under the influence of intoxicants, and he read Maine's "implied consent" warnings to her verbatim from a form provided by the Secretary of State's Bureau of Motor Vehicles. *See* 29-A M.R.S. § 2521 (2017). Included was the warning, "If you are convicted of operating while under the influence of intoxicating liquor or drugs, your failure to submit to a chemical test will be considered an aggravating factor at sentencing which in addition to other penalties, will subject you to a mandatory minimum period of incarceration." LeMeunier-Fitzgerald agreed to submit to the blood test, and a blood sample was taken from her without a warrant.

[¶5] LeMeunier-Fitzgerald was charged by complaint, and she was later indicted, for operating under the influence (Class C), 29-A M.R.S.

§ 2411(1-A)(B)(2), and operating beyond a license condition or restriction (Class E), 29-A M.R.S. § 1251(1)(B). She moved to suppress the blood test results as having been procured without a warrant and without voluntary consent, in violation of the Fourth Amendment to the United States Constitution. The court held a hearing on the motion to suppress on July 26, 2016. The parties stipulated that (1) the officer had probable cause to believe that LeMeunier-Fitzgerald was operating while under the influence of an intoxicant, (2) her blood was drawn without a search warrant, and (3) there were no exigent circumstances. The court then heard brief testimony from the officer who had taken LeMeunier-Fitzgerald into custody. For purposes of the motion, that testimony was not disputed by LeMeunier-Fitzgerald.

[¶6] The court denied the motion to suppress, reasoning that, unlike the situation that the United States Supreme Court recently addressed in *Birchfield v. North Dakota*, LeMeunier-Fitzgerald did not submit to the blood testing "on pain of committing a criminal offense." 579 U.S. ---, 136 S. Ct. 2160, 2186 (2016). The court concluded that the heightened minimum penalties, including a mandatory minimum period of incarceration, that may be imposed on a person who refuses to submit to testing if convicted of OUI were not equivalent

to an independent criminal offense for refusal as described in *Birchfield.* 579 U.S. at ---, 136 S. Ct. at 2169-70, 2186.

[¶7] LeMeunier-Fitzgerald entered a conditional guilty plea, preserving her right to appeal from the ruling on the motion to suppress, and the court (*Mullen, J.*) sentenced her to three years in prison, with all but forty-five days suspended,[2] and two years of probation for the OUI conviction and forty-five days in prison, to run concurrently, for the conviction of operating beyond a license condition or restriction.  The court also imposed fines and surcharges amounting to $1,405.

[¶8] LeMeunier-Fitzgerald timely appealed. *See* 15 M.R.S. § 2115 (2017); M.R. App. P. 2(b)(2)(A) (Tower 2016).[3]  She argues that the blood test violated the Fourth Amendment's protection against unreasonable searches and seizures because it was taken without a warrant and her consent to the test was rendered involuntary by the warning of an increased minimum sentence if she refused to consent and was then convicted.

---

[2] LeMeunier-Fitzgerald had apparently been convicted of OUI on previous occasions.

[3] The appeal was commenced before the restyled Maine Rules of Appellate Procedure took effect. *See* M.R. App. P. 1 (providing that the restyled rules are effective for "appeals in which the notice of appeal is filed on or after September 1, 2017").

## II. DISCUSSION

[¶9]   We anchor our analysis in the language of the United States Constitution.  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  There is no question that strictures of the Fourth Amendment apply to searches in the form of blood tests.  *See Schmerber v. California*, 384 U.S. 757, 767-72 (1966).  The question is how those strictures apply here.

[¶10]  In recent years, courts across the country have been challenged to find an appropriate balance between a defendant's right to be free from "unreasonable" searches of their blood for its alcohol content and the State's interest in addressing the public safety crisis resulting from impaired drivers causing death and destruction on America's roads.[4]  U.S. Const. amend. IV.  We endeavor here to assure that the constitution's prohibition against unreasonable searches and seizures is given full force, with the required

---

[4]  *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 159-63 (2013); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 451-55 (1990); *United States v. Brock*, 632 F.3d 999, 1002-03 (7th Cir. 2011); *see also State v. Boyd*, 2017 ME 36, ¶¶ 8-15, 156 A.3d 748; *State v. Arndt*, 2016 ME 31, ¶¶ 5-11, 133 A.3d 587.

determination of reasonableness informed by a full consideration of urgent public safety considerations.[5]  In this opinion, we (A) summarize the Fourth Amendment jurisprudence regarding searches undertaken for purposes of blood-alcohol testing; (B) review the statutory basis for providing warnings about the legal consequences of a refusal to submit to testing; and (C) consider the legal question of whether a driver who consents to a blood draw after receiving such warnings has voluntarily consented, recognizing, as the First Circuit has eloquently explained, that a defendant's consent that has been "pried loose by . . . a claim of authority is merely acquiescence." *United States v. Vazquez*, 724 F.3d 15, 23 (1st Cir. 2013).

A.    Alcohol Testing and the Fourth Amendment

[¶11]  We begin with the bedrock understanding that the withdrawal of a blood sample from the veins or arteries of a human being for blood-alcohol testing is a "search" falling within the protection of the Fourth Amendment.  *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2173; *Schmerber*, 384 U.S. at 767; *State v. Boyd*, 2017 ME 36, ¶ 8, 156 A.3d 748; *State v. Arndt*, 2016 ME 31, ¶ 8,

---

[5] The National Highway Traffic Safety Administration reports that, in 2016, 10,497 people died in traffic accidents involving at least one driver with a blood-alcohol content of .08 grams per deciliter or more.  Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts: Alcohol Impaired Driving*, DOT HS 812 450 at 2 (Oct. 2017).  That is the highest reported number of fatalities since 2009.  *Id.*

133 A.3d 587. The Fourth Amendment prohibits unreasonable searches, and the procurement of a legitimate search warrant, with all that it entails, is designed to ensure the reasonableness of a search. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 622 (1989).

[¶12] As is also clear, however, there are "a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Missouri v. McNeely*, 569 U.S. 141, 148-49 (2013); *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *see, e.g.*, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) (holding that a warrantless search of an automobile is reasonable if the automobile is readily mobile and the search is supported by probable cause); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 453-55 (1990) (holding that the use of a sobriety checkpoint was reasonable when it was instituted based on objective indicia of effectiveness).

[¶13]  In addressing the reasonableness of searches aimed at detecting impaired driving, the Supreme Court has held that a *breath test* measuring blood-alcohol content is a search that does not require a warrant, consent, or other exceptions, as long as there is probable cause to believe that the driver was operating, or attempting to operate, a vehicle while under the influence. *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2184-85.  The Court has reasoned that a breath test is less intrusive than a blood test, and when balanced against the law enforcement needs of keeping impaired drivers off the roads, it is reasonable, even without a warrant, for a law enforcement officer to require a driver to submit to a breath test if probable cause exists.  *See id.*

[¶14]  Because it is more intrusive, however, a warrantless blood draw cannot be justified as a search incident to an arrest for OUI.  *Id.* at 2185.  Thus, some other exception to the warrant requirement is necessary to establish the reasonableness of the blood draw to test for alcohol.

[¶15]  The parties have agreed that the consent exception is the only exception at issue on appeal.[6]  The question before us concerns whether, given

---

[6] The State did not argue that exigent circumstances justified the blood draw.  As the United States Supreme Court has held, the natural dissipation of alcohol in a suspect's blood does not categorically support a finding of exigent circumstances, and more than the mere fact that alcohol dissipates over time is required to establish such an exigency. *McNeely*, 569 U.S. 141, 156 (2013); *Arndt*, 2016 ME 31, ¶ 10, 133 A.3d 587.  In the matter before us, exigent circumstances may have arisen due to the possible unavailability of a breathalyzer at the hospital, LeMeunier-Fitzgerald's observed consumption of a bottle's worth of pills when the officer approached her in the parking lot, and the

the need to prevent drivers from operating vehicles while under the influence of intoxicants, it is reasonable to draw a driver's blood without procuring a warrant when the driver has consented to a blood test after being read Maine's statutory warnings about the consequences of refusing to submit to testing.

B.      The Duty to Submit to Testing and Warnings of the Consequences of Refusing to Submit

[¶16]  Due to concerns about deaths and injuries resulting from drunk driving, States have adopted laws designed to ensure the testing of blood-alcohol levels through breath or blood tests, predominantly through statutes providing that drivers "imply" their consent to testing by operating vehicles on the roads.  *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2166, 2168-69. The Maine Legislature enacted its "implied consent" law to take effect on October 1, 1969.  P.L. 1969, ch. 439, § 1 (codified at 29 M.R.S.A. § 1312 (Supp. 1970)).  That statute provided that any person operating or attempting to operate a motor vehicle in Maine who had been arrested for operating while

---

potential dissipation of the evidence through treatment at the hospital. *See Birchfield v. North Dakota*, 579 U.S. at ---, 136 S. Ct. 2160, 2184 (2016) (stating that "[o]ne advantage of blood tests is their ability to detect not just alcohol but also other substances that can impair a driver's ability to operate a car safely," and indicating that police may rely on the exigent circumstances exception to the warrant requirement if there is insufficient time to seek a warrant in such circumstances).  Nonetheless, the State did not assert exigency, it did not present evidence upon which the court could have reached findings and analyzed that exception, and we do not address the exception further.

intoxicated would "be deemed to have given consent to a chemical test of the blood alcohol level of his blood or urine." *Id.*

[¶17] More than a decade later, in response to our decision interpreting the "implied consent" statute, *State v. Plante*, 417 A.2d 991 (Me. 1980),[7] the Legislature amended the statute, eliminating the presumption of consent upon operation of a vehicle and establishing a duty to submit to testing. *See* P.L. 1981, ch. 679, § 12 (effective April 15, 1982) (codified at 29 M.R.S.A. § 1312 (Supp. 1982)). The present statute, 29-A M.R.S. § 2521(1) (2017), which was in effect when LeMeunier-Fitzgerald's blood was drawn, provides, "If there is probable cause to believe a person has operated a motor vehicle while under the influence of intoxicants, that person *shall submit to and complete a test* to determine an alcohol level and the presence of a drug or drug metabolite by analysis of blood, breath or urine." (Emphasis added.) The statute provides for the administration of a breath test "unless, in th[e] officer's determination, a breath test is unreasonable," in which case "another chemical test must be administered in place of a breath test." *Id.* § 2521(2).

---

[7] There, we interpreted the statute to provide that a person had a duty to submit to testing and had "the power—though not the right—to refuse to perform that duty." *State v. Plante*, 417 A.2d 991, 993 (Me. 1980).

12

[¶18]   Thus, although Maine's chemical testing statute bears the title "Implied consent to chemical tests," the statute "no longer provides that a person will be 'deemed' to have consented to testing by operating a motor vehicle on Maine's roads." *Boyd*, 2017 ME 36, ¶ 13, 156 A.3d 748.  The statute was amended to impose on a driver a duty to submit to testing when there is probable cause to believe that the driver has operated a motor vehicle while under the influence.   *Id.*   Accordingly, we refer to the statute as the "duty-to-submit" statute and clarify that LeMeunier-Fitzgerald did not, by operation of her vehicle, "imply" that she consented to chemical testing.

[¶19]  The duty to submit does not, however, create a statutory *mandate* to submit to testing.  Rather, it provides specific consequences for a driver's decision not to comply with that duty.  *See* 29-A M.R.S. § 2521(3), (5), (6) (2017).  In order for the consequences of refusal to apply, the driver must have been provided with a direct and clear explanation of those consequences.  *See id.* § 2521(3).

[¶20]  The specific question before us concerns the voluntariness of LeMeunier-Fitzgerald's verbal consent given after receiving warnings of the consequences of refusing, despite the existence of probable cause, to submit to testing.  With respect to such warnings, the statute provides:

Neither a refusal to submit to a test nor a failure to complete a test may be used for any of the purposes specified in paragraph A, B or C unless the person has first been told that the refusal or failure will:

A. Result in suspension of that person's driver's license for a period up to 6 years;

B. Be admissible in evidence at a trial for operating under the influence of intoxicants; and

C. Be considered an aggravating factor at sentencing if the person is convicted of operating under the influence of intoxicants that, in addition to other penalties, will subject the person to a mandatory minimum period of incarceration.

*Id.* § 2521(3). Thus, if a driver has first been warned of the statutory consequences, the driver's refusal to comply with the statutory duty to submit can result in (A) up to six years' suspension of the driver's license; (B) the admission at trial of the driver's refusal to submit to testing; and (C) increased minimum penalties if the driver is convicted of OUI, including a mandatory minimum period of incarceration. *See id.* § 2521(3), (5), (6); *see also* 29-A M.R.S. § 2411(5)(A)(1), (A)(3)(b), (B)(1), (B)(2), (C)(1), (C)(2), (D)(1), (D)(2) (2017). We now consider whether this statutory scheme imposes unconstitutionally coercive consequences for refusing to submit to testing, such that the warning of those consequences could have undermined the voluntariness of

14

LeMeunier-Fitzgerald's consent. *See Birchfield*, 579 U.S. at ---, 136 U.S. at 2184-85.

C.    Voluntariness of Consent after Statutory Warnings

[¶21]  Even in the absence of a warrant, a search is reasonable—and the evidence obtained is admissible—if a person voluntarily consents to the search. *See Randolph*, 547 U.S. at 109; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Cress,* 576 A.2d 1366, 1367 (Me. 1990).  When a defendant moves to suppress evidence obtained without a warrant and the State asserts that no warrant was required because the suspect consented to the search, it is the State's burden to prove, "by a preponderance of the evidence, that an objective manifestation of consent was given by word or gesture."  *State v. Bailey*, 2012 ME 55, ¶ 16, 41 A.3d 535 (quotation marks omitted).

[¶22]  The question of voluntariness is "'determined from the totality of all the circumstances.'"  *Birchfield*, 579 U.S. ---, 136 S. Ct. at 2186 (quoting *Schneckloth*, 412 U.S. at 227).  A search is unreasonable if a person's consent to the search was "coerced, by explicit or implicit means, by implied threat or covert force" or duress, or was induced by "deceit, trickery, or misrepresentation." *Schneckloth*, 412 U.S. at 228; *State v. Barlow*, 320 A.2d 895, 900 (Me. 1974); *see State v. Koucoules*, 343 A.2d 860, 873 (Me. 1974).

[¶23]  The circumstances under which LeMeunier-Fitzgerald agreed to submit to a blood test are undisputed; the parties' disagreement centers on the effect of the warnings on the voluntariness of her consent.[8]  In the absence of any factual dispute, "we review de novo the motion court's ruling on suppression." *State v. Tozier*, 2006 ME 105, ¶ 6, 905 A.2d 836.

[¶24]  To address the legal issue presented, we must determine whether the consent exception to the warrant requirement applies to a defendant who gave her consent upon receiving the specific statutory warnings at issue here.[9]

---

[8]  On an appeal from a denial of a motion to suppress, we review any disputes about the court's findings for clear error and the ultimate question of whether the facts establish an individual's consent de novo.  *See State v. Nadeau*, 2010 ME 71, ¶ 18, 1 A.3d 445.  Here, the facts found by the court are not in dispute: the "officer had probable cause to believe that [LeMeunier-Fitzgerald] was operating a motor vehicle while under the influence of an intoxicant"; in the hospital, while in police custody, she "agreed to submit to a blood test after being read the Maine implied consent law"; "a blood sample was taken without a warrant[;] and there were no exigent circumstances."  Thus, we are in a position to review a straightforward legal issue based on an officer acting in accordance with the statute governing the warnings and are not required to remand the matter for the court to reach findings about disputed key facts.  *See State v. Clay*, 793 S.E.2d 636, 639 (Ga. Ct. App. 2016) (stating that a defendant's affirmative response to statutory warnings "may itself be sufficient evidence of actual and voluntary consent, absent reason to believe the response was involuntary" (quotation marks omitted)); *cf. United States v. Hutchinson*, No. 2:16-CR-168-DBH, 2018 U.S. Dist. LEXIS 7180, at *16-19 (D. Me. Jan. 17, 2018) (reaching findings after three witnesses testified differently about what happened when the defendant's blood was drawn); *Espinoza v. Shiomoto*, 215 Cal. Rptr. 3d 807, 823-34 (Cal. Ct. App. 2017) (reviewing whether a driver voluntarily consented to testing, or instead refused testing, when she conditioned her consent on the police obtaining a warrant and no warrant was obtained); *Boyd*, 2017 ME 36, 156 A.3d 748 (reviewing the voluntariness of consent when no warnings were read); *State v. Blackman*, 898 N.W.2d 774, 778, 781-89 (Wis. 2017) (reviewing whether a driver voluntarily consented when the form that the officer read misstated the legal consequences of refusal for the driver at issue).

[9]  In contrast to the facts presented in a case recently decided by United States District Court Judge D. Brock Hornby, the officer here did not misrepresent the law to the defendant.  *See Hutchinson*, 2018 U.S. Dist. LEXIS 7180, at *20-21.  LeMeunier-Fitzgerald was informed that her refusal would have consequences, but she was not told that she had no choice in the matter.  *Id.* at *5.

If the imposition of a minimum mandatory sentence upon a driver's conviction of OUI after refusing testing is unconstitutionally coercive, the warning of that possible consequence throws into question the voluntariness of consent. *See Birchfield*, 579 U.S. ---, 136 S. Ct. at 2186 (remanding for the state court to determine whether a suspect's consent to a blood test was voluntary when he consented only after police erroneously told him that the law required him to submit or face prosecution for the crime of refusal); *see also Barlow*, 320 A.2d at 900.

[¶25] Unlike the North Dakota statute reviewed in *Birchfield*, Maine's statute includes no threat of a separate, independent criminal charge for refusing to submit to testing. *Cf. Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2169-70. Nor does the refusal to submit expose the driver to any additional threat of immediate incarceration. *See* 29-A M.R.S. § 2521(3). Instead, the statutory warnings make the driver aware that a choice must be made, and they inform the driver of the potential consequences of refusing to comply with the duty to submit to testing. *See id.*; *see also Commonwealth v. Myers*, 164 A.3d 1162, 1164 (Pa. 2017) (stating that a statutory warning of the possible consequences of refusing blood testing informed the driver of the right to refuse); *cf. Olevik v. State*, 806 S.E.2d 505, 521-22 (Ga. 2017) (same, in a breath testing case).

[¶26]  The possible consequences conveyed in those warnings relate to licensing, the admissibility of the refusal in evidence at trial, and increased minimum penalties for purposes of a court's sentencing if the driver is convicted of OUI.  *See* 29-A M.R.S. § 2521(3).  As the Supreme Court has previously determined, neither the threat of evidentiary use of the refusal nor the threat of license suspension renders the consent involuntary.  *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2185 (referring "approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply"); *McNeely*, 569 U.S. at 161; *see also South Dakota v. Neville*, 459 U.S. 553, 559-60, 564-66 (1983) (holding that a license suspension for refusing a blood-alcohol test is "unquestionably legitimate" and that the admission of a suspect's refusal to take a blood-alcohol test violates neither the privilege against self-incrimination nor the suspect's right to due process).[10]  The question then is whether the additional threat of a mandatory minimum sentence is unconstitutionally coercive and renders the consent involuntary.

---

[10]  *See also Mackey v. Montrym*, 443 U.S. 1, 19 (1979) ("[T]he compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available.").

[¶27] The Court's statement in *Birchfield* that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense" specifically addressed true implied consent statutes that deem a motorist to have consented to chemical testing in advance and provide that the failure to consent constitutes a crime in itself. *Birchfield*, 579 U.S. ---, 136 S. Ct. at 2186. Whether a statute deems a driver to have consented or, as in Maine, imposes a duty to submit to testing, the coercive effect is the same if the statute punishes the refusal to submit to testing with a criminal offense. Accordingly, if Maine's statutes imposed a duty to submit to a blood test "on pain of committing a criminal offense," an officer's warning that it is a crime to refuse would be unconstitutionally coercive and could, in the totality of the circumstances, undermine the voluntariness of the driver's consent. *See id.*

[¶28] Maine's statutes do not, however, have this effect. In Maine, a driver's refusal to comply with the statutory duty to submit to a blood test upon probable cause will result in an enhanced penalty, one that is well within the statutory maximum for any person charged with OUI, only if the driver is ultimately convicted of OUI after that refusal. *See* 29-A M.R.S. §§ 2411(5)(A)(1), (A)(3)(b), (B)(1), (B)(2), (C)(1), (C)(2), (D)(1), (D)(2), 2521(3). To illustrate, if the defendant who submits to testing has had no prior OUI convictions within

the previous ten years and no other penalty-enhancing facts are present, an OUI offense is a Class D crime, which is punishable by imprisonment for up to 364 days and a fine of $500 to $2,000, and there is no mandatory minimum period of incarceration. 17-A M.R.S. §§ 1252(2)(D), 1253(2-A)(D), 1301(1-A)(D) (2017); 29-A M.R.S. § 2411(5)(A) (2017). If that same defendant is instead convicted of OUI after "fail[ing] to submit to a test at the request of a law enforcement officer," the upper limit of potential imprisonment provided by statute remains exactly the same—up to 364 days—but the period of imprisonment must be at least "96 hours." 29-A M.R.S. § 2411(5)(A)(3)(b). Similarly, the maximum possible fine is unaffected, though a person who has "failed to submit to a test" is subject to a fine of at least $600. *Id.* § 2411(5)(A)(1).

[¶29] Under no circumstances, however, does the statute increase the level of the offense or otherwise increase the range beyond the maximum period of imprisonment or the maximum fine that may be imposed for the applicable class of the offense. *See* 29-A M.R.S. § 2521(3)(C); *see also* 17-A M.R.S. § 1252(2) (establishing the maximum period of incarceration for each class of crime); 17-A M.R.S. § 1301(1-A) (2017) (establishing the maximum fine that may be imposed for each class of crime). Furthermore, in

an individual case, the refusal to submit might not, practically speaking, result in any demonstrable increase in punishment whatsoever because a court may impose a sentence at or above the statutory minimum for *any* conviction of the charged OUI offense.

[¶30]  Because the mandatory minimum sentence applies only upon an OUI conviction and the statute does not criminalize the mere act of refusing to submit to a blood test, and because it does not increase a driver's maximum exposure to a fine or sentence of imprisonment, the statute's setting of a mandatory minimum sentence if a driver is convicted of OUI after refusing to submit to a blood test despite probable cause is not a "criminal penalt[y] on the refusal to submit to such a test" within the meaning of *Birchfield*.  579 U.S. ---, 136 S. Ct. at 2185.  Although there is a "limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads," *see id.*, that limit is not exceeded where the consequence is only the risk of an increased *minimum* penalty if a driver, having received warnings of the consequences of a refusal, declines to submit to blood testing and is ultimately convicted of OUI, *see* 29-A M.R.S. § 2521(1), (3); *see also* 29-A M.R.S. § 2411(5).

[¶31] In sum, when probable cause exists, a warrantless blood test is not unreasonable when a driver has consented to testing after being warned that the lower limit of a court's sentencing range will increase if the driver refuses to submit to testing and is ultimately convicted of OUI. *Cf. Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2185-86. The warnings given based on the statute are legally sound and not misleading. *See Barlow*, 320 A.2d at 900; *cf. Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2185-86. Put another way, a consent given in response to the Maine warnings does not represent mere "acquiescence." *Vazquez*, 724 F.3d at 23.

[¶32] Here, LeMeunier-Fitzgerald was accurately warned by the arresting officer in the hospital that she had a duty to submit to chemical tests and that she would be lawfully subject to a mandatory minimum at sentencing if convicted of OUI after refusing to submit. The warnings informed LeMeunier-Fitzgerald of the other statutory consequences that would arise if she refused to submit to the test despite her duty to do so. *See Birchfield*, 579 U.S. ---, 136 S. Ct. at 2185. The warnings did not constitute any form of deceit, misrepresentation, or trickery. *See Barlow*, 320 A.2d at 900. Her refusal did not give rise to a separate criminal charge. *Cf. Birchfield*, 579 U.S. ---, 136 S. Ct. at 2186. After receiving the information, LeMeunier-Fitzgerald expressly

22

agreed to undergo the blood test. The court did not err in concluding, in the undisputed totality of the circumstances, that LeMeunier-Fitzgerald's consent was voluntary and not induced by unconstitutional coercion or misrepresentation, and therefore the court properly denied her motion to suppress. *See Schneckloth*, 412 U.S. at 228; *Barlow*, 320 A.2d at 900; *see also Tozier*, 2006 ME 105, ¶ 6, 905 A.2d 836.

The entry is:

Judgment affirmed.

_____

GORMAN, J., with whom JABAR, J., joins and HJELM, J., joins in part, dissenting.

[¶33] Today, the Court has concluded that, despite the explicit and implicit coercive threats found in Maine's duty-to-submit statute, Lyanne LeMeunier-Fitzgerald's "consent" to having blood drawn was voluntary. I respectfully dissent.

[¶34] Consent, like all exceptions to the requirement of a warrant, must be narrowly construed. *State v. Sargent*, 2009 ME 125, ¶ 10, 984 A.2d 831. We have long held that consent is effective in a Fourth Amendment analysis only when it is "freely and voluntarily given" without either "implied threat or covert force." *State v. McLain*, 367 A.2d 213, 216-17 (Me. 1976). Consent induced by

"deceit, trickery or misrepresentation" or "physical violence or threats" cannot be said to have been given voluntarily. *State v. Barlow*, 320 A.2d 895, 900 (Me. 1974). I believe that the Court errs in determining that LeMeunier-Fitzgerald's consent to having her blood drawn was "freely and voluntarily given," as the Fourth Amendment demands. *McLain*, 367 A.2d at 216-17.

[¶35] In *Birchfield v. North Dakota*, the United States Supreme Court considered consent within the intersection of state "implied-consent laws" and the Fourth Amendment's prohibition on unreasonable searches and seizures. 579 U.S. ---, 136 S. Ct. 2160, 2176-78, 2184-85 (2016). *Birchfield* involved three factual scenarios. *Id.* at 2170-72. In the two scenarios involving blood tests,[11] defendants Danny Birchfield and Steve Beylund were, in separate incidents, arrested in North Dakota for driving while impaired. *Id.* at 2170-72. After arrest, each was asked to submit to a warrantless blood test to determine his degree of impairment. *Id.* Birchfield refused to submit to the test; was charged with and convicted of that refusal; and, as a result of a conditional plea, appealed that criminal conviction. *Id.* at 2170-71. Beylund agreed to submit to

---

[11] The third factual scenario involved a breath test rather than a blood test, and it is therefore distinguishable on that basis. *Birchfield v. North Dakota*, 579 U.S. ---, 136 S. Ct. 2160, 2171, 2176-78, 2186 (2016); *State v. Boyd*, 2017 ME 36, ¶ 8, 156 A.3d 748.

24

the test and, after an administrative hearing, he was fined and his license to operate motor vehicles was revoked for two years based on the results of the blood test. *Id*. at 2172, 2186. Beylund appealed that administrative decision. *Id*. at 2172. The North Dakota Supreme Court affirmed both decisions, and the United States Supreme Court agreed to consider Birchfield's and Beylund's appeals in a consolidated argument. *Id*. at 2171-72.

[¶36] Both Birchfield and Beylund were informed that refusing to submit to a blood test would expose them to criminal penalties. *Id.* at 2170, 2172. Because Birchfield did not submit to the blood test, the voluntariness of a consent to search was not at issue in his case; no search was completed because no blood was drawn. *Id.* at 2170. Rather, Birchfield was convicted of the crime of refusing to submit to the blood test based on North Dakota's implied consent statute in effect at the time.[12] *Id.* at 2170-71; *see* N.D. Cent. Code Ann. §§ 39-08-01(1)(e), (2)-(3), 39-20-01, 39-20-14 (LEXIS, 2013 N.D. Code Archive). Holding that reasonableness—as "the touchstone of Fourth Amendment analysis"—demands that "motorists cannot be deemed to have

---

[12] At the time of Birchfield's arrest in North Dakota, refusing to submit to blood alcohol testing was itself a criminal offense for which the mandatory minimum sentence included a fine and addiction treatment. N.D. Cent. Code Ann. § 39-08-01(1)(e), (2), (5)(a)(1) (LEXIS, 2013 N.D. Code Archive). The relevant North Dakota statutes have since been amended in several respects. *See* N.D. Cent. Code Ann. §§ 39-08-01, 39-20-01, 39-20-14 (LEXIS through 2017 Regular Legis. Session).

consented to submit to a blood test on pain of committing a criminal offense," the Supreme Court reversed Birchfield's conviction for refusing the blood test. *Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2186.

[¶37]   Beylund, in contrast, submitted to the blood draw; he was not criminally prosecuted for his refusal, but he was fined and his driver's license was revoked for two years after an administrative hearing.  *Id.* at 2172, 2186. The Supreme Court noted that the violation of an implied consent statute *could* be a basis for imposing civil penalties or evidentiary consequences on drivers without running afoul of the Fourth Amendment.[13]  *Id.* at 2185.  Even in the context of an administrative matter, however, Beylund still enjoyed the constitutional right to refuse to consent to a blood test, and his consent to such a blood test was still effective only if voluntary; the results of Beylund's blood test would be inadmissible in the administrative proceeding if obtained without consent.  *Id.* at 2186 & n.9.  The Supreme Court thus remanded the matter for the trial court to reconsider whether Beylund's submission to the blood test

---

[13] The Supreme Court stated, "Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them." *Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2185.  LeMeunier-Fitzgerald has not presented any argument that either the suspension of her license or the admission of evidence of her refusal against her at trial would violate the Fourth Amendment.

26

was truly consensual, given that the police had incorrectly informed Beylund that refusing the blood test was criminal. *Id.*

[¶38] I agree that Maine's imposed sanctions for refusing to submit to a blood draw are not precisely the same as those discussed in any of the three cases comprising the *Birchfield* decision. *See* Court's Opinion ¶ 25. In Maine, refusal is an aggravating factor in the sentencing of a defendant convicted of operating under the influence (OUI), 29-A M.R.S. §§ 2411(5), 2521 (2017), whereas in North Dakota at the time of Birchfield's and Beylund's arrests, refusal was an independent crime, N.D. Cent. Code Ann. § 39-08-01(1)(e), (2) (LEXIS, 2013 N.D. Code Archive). I respectfully disagree, however, with the Court's attempt to distinguish the *effect* of the criminal penalties in Maine from those addressed in North Dakota.

[¶39] In both states, an arrestee is persuaded to submit to a blood test or else face criminal consequences beyond those for which she has already been arrested. Indeed, a comparison of the two states' statutes demonstrates that although Maine does not have a separate crime for refusal, the potential consequences to a defendant for a refusal are harsher—both generally and as compared to a nonrefusal OUI conviction—in Maine than in North Dakota. By North Dakota statute in 2013, a defendant was subject to exactly the same

criminal penalties for a first offense refusal as for a first offense OUI, that is, a minimum fine of five hundred dollars and required addiction treatment. N.D. Cent. Code Ann. §§ 39-08-01(1)(e), (2)-(3), (5)(a), 39-20-01(3) (LEXIS, 2013 N.D. Code Archive). The only difference between a conviction for OUI and one for refusal was that those who were convicted of refusing a blood test were also subject to a license revocation of between 180 days and 3 years. N.D. Cent. Code Ann. § 39-20-01(3). Thus, whether convicted of OUI or refusal, a North Dakota defendant was exposed to identical fine calculations and periods of incarceration.

[¶40]  In Maine, a first-offense OUI conviction carries a minimum sentence of a $500 fine and a license suspension of 150 days.[14]  29-A M.R.S. § 2411(5)(A)(1)-(2).  If a defendant is convicted of OUI and, as part of that conviction, the State also proves that the defendant refused a breath or blood test, the court *must* impose a minimum fine of $600, a minimum license suspension of 150 days, and a minimum jail term of 96 hours.  29-A M.R.S. § 2411(5)(A)(1), (2), (3)(b).  In addition, the defendant's license is suspended for an additional 275 days.  29-A M.R.S. § 2521(6).  That means that each

---

[14]  A minimum period of incarceration of forty-eight hours is imposed for an OUI conviction if certain aggravating factors are present.  29-A M.R.S. § 2411(5)(A)(3)(a) (2017).

individual convicted of OUI, when that conviction involves a refusal, receives a sentence that involves an additional $100 in fines, an extension to his license suspension, and a 4-day jail sentence. 29-A M.R.S. §§ 2411(5)(A)(1)-(3), 2521(6). For defendants with prior offenses, the differences between an OUI and an OUI with refusal become more significant—a $700 versus a $900 fine and seven days in jail versus twelve days in jail as to a second offense; $1,100 versus $1,400 and thirty days versus forty days for a third offense; and $2,100 versus $2,500 and six months versus six months and twenty days for a fourth offense. 29-A M.R.S. § 2411(5)(B)(1)-(2), (C)(1)-(2), D(1)-(2).

[¶41] The Court concludes, however, that because the applicable class of the offense is the same whether the defendant is convicted of OUI or OUI with a refusal—and therefore the *maximum* sentences are identical—no "demonstrable increase in punishment" can be said to result from the refusal. Court's Opinion ¶ 29. This point is grounded primarily in the government's interest in crime classification systems. In determining whether LeMeunier-Fitzgerald's consent was voluntarily given, however, we are primarily concerned with the effect of the government's warnings *on LeMeunier-Fitzgerald*. *See Birchfield*, 579 U.S. ---, 136 S. Ct. at 2186. That she could be charged with the same class of crime with the same maximum

sentence, whether or not she refused to submit to the blood test, does not render LeMeunier-Fitzgerald's consent voluntary in light of the warning that one option—refusing to submit—would subject her to a higher minimum criminal penalty. The sentence for OUI *might* be higher than the mandatory minimum for OUI, but the sentence for OUI with refusal *must* be higher than the mandatory minimum for OUI.

[¶42] Although it is true that a defendant in Maine, unlike a defendant in North Dakota in 2013, can be sentenced to those heightened terms only if convicted of the underlying OUI, 29-A M.R.S. § 2411(1-A)(A), (C) (2017), this is a distinction without a difference. Whether a criminal penalty for refusal is labeled an independent crime, an increase in the class of crime (thereby increasing the authorized sentence), or the imposition of a heightened authorized or mandatory minimum sentence, the legal effect on a defendant is indistinguishable: the defendant who refuses to submit to a blood test and is convicted of that refusal as part of an OUI conviction is subjected to a minimum criminal penalty for the refusal that otherwise would not apply. Given this identical effect, I submit that we must evaluate Maine's duty-to-submit statute as applied to LeMeunier-Fitzgerald according to the Supreme Court's analysis in *Birchfield*.

[¶43]  The crux of the Supreme Court's disposition as to Birchfield was its conclusion that it is a violation of the Fourth Amendment to expose a defendant to criminal penalties for his or her lawful exercise of the right to withhold consent to a search in the form of a blood test.  *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2186.  This conclusion is supported by countless decisions prohibiting the government from forcing a person to waive a constitutional right.  *See, e.g.*, *Iowa v. Tovar*, 541 U.S. 77, 81 (2004) ("Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a knowing, intelligent act done with sufficient awareness of the relevant circumstances." (alteration omitted) (quotation marks omitted)); *Miranda v. Arizona*, 384 U.S. 436, 476 (1966) ("[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."); *State v. Hill*, 2014 ME 16, ¶¶ 5-6, 86 A.3d 628 (stating that a waiver of the constitutional right to counsel must be "voluntary, knowing, and intelligent"); *State v. Prescott*, 2012 ME 96, ¶¶ 11-17, 48 A.3d 218 (holding that the defendant's statements to police— which were made when the defendant reasonably felt she was constrained by the police—must be suppressed); *State v. Tuplin*, 2006 ME 83, ¶¶ 19-20, 901 A.2d 792 (discussing the best practice to avoid the defendant "feel[ing]

pressured into giving up his right to remain silent"). Fourth Amendment jurisprudence imposes no duty on a criminal defendant to consent or submit to a search. *See Barlow*, 320 A.2d at 899 ("Coercion which will invalidate consent and render a search unreasonable in constitutional reference is not solely confined to a consent obtained by threats or force, but is equally operative in those situations where the consent is granted only in submission to a claim of lawful authority.").

[¶44]  The crux of the Supreme Court's disposition regarding Beylund was its conclusion that threatening to expose a defendant to criminal penalties for exercising his lawful right to refuse a blood test implicates the voluntariness of a person's consent to such a blood test even in the context of administrative proceedings.  *See Birchfied*, 579 U.S. at ---, 136 S. Ct. at 2186.  The logical corollary to both principles is that it is a violation of the Fourth Amendment to allow the State, in a criminal matter, to use the evidence obtained from a search undertaken after warning the accused that, if she is convicted of OUI, her refusal will be used as evidence against her during trial and, if proved, will subject her to an increased criminal penalty.

[¶45]  In a criminal prosecution, when the State fails to obtain the warrant that is the hallmark of a reasonable search and seizure and when no

exigent circumstances otherwise exist, the State may not use the only avenue remaining to justify the search—obtaining the suspect's consent to the search—by informing the suspect that she has *no lawful choice but to consent*. Just as it is per se unreasonable to subject a defendant to a criminal penalty for refusing a blood test, the threat of such a criminal penalty negates any consent given after such a warning in the context of a criminal prosecution. In my view, LeMeunier-Fitzgerald's consent to her blood test in these circumstances was coerced and involuntary as a matter of law. *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2186.

[¶46] Because LeMeunier-Fitzgerald's consent was not "freely and voluntarily given," the test was an unreasonable search within the meaning of the Fourth Amendment. The long-established remedy for unreasonable searches is set out in the exclusionary rule: the evidence obtained as a result of that unreasonable search was therefore inadmissible at trial.[15] *See Mapp v. Ohio*, 367 U.S. 643, 655-60 (1961); *State v. McNaughton*, 2017 ME 173, ¶ 42,

---

[15] The application of the exclusionary rule is distinguishable from the point made in *Birchfield* that, in its earlier decisions, the Supreme Court had "referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorist who refuse to comply." 579 U.S. at ---, 136 S. Ct. at 2185. There, the Supreme Court was discussing the admission of the *fact* of the defendant's refusal, *id.*, whereas LeMeunier-Fitzgerald's case regards the admission of the *evidence obtained as a result* of an unreasonable search performed in the absence of a warrant, exigent circumstance, or consent.

168 A.3d 807; *State v. Hawkins*, 261 A.2d 255, 257-58 (Me. 1970). I would vacate LeMeunier-Fitzgerald's conviction and remand with instructions to grant her motion to suppress the results of her blood alcohol test.[16]

---

JABAR, J., dissenting.

[¶47] I agree with Justice Gorman's analysis, but I write separately because I do not believe her dissent goes far enough. I agree that LeMeunier-Fitzgerald's consent to the blood test, obtained under what amounted to the threat of an enhanced criminal penalty, was coerced and involuntary as a matter of law. Gorman, J., Dissenting Opinion ¶¶ 42, 45. However, I have additional serious concerns with the State's implied consent form, which informs drivers (1) that there exists a "duty" to submit to a blood test, and (2) that evidence of refusal will be admissible in evidence at trial against the accused driver. These two representations within the form—and read to LeMeunier-Fitzgerald—constitute misrepresentations of the law.

---

[16] The State argues that suppression of the test results was not required because the officer was acting in "good faith reliance on existing law," which, it argues, is a recognized exception to the exclusionary rule that applies when "new developments in the law have upended the settled rules on which the police relied." *United States v. Sparks*, 711 F.3d 58, 68 (1st Cir. 2013); *see Davis v. United States*, 564 U.S. 229, 236 (2011). We have not heretofore adopted this rule and I see no reason to do so regarding the consent exception to the requirement of a warrant imposed by the Fourth Amendment. *See Birchfield*, 579 U.S. at ---, 136 S. Ct. at 2186 n.9 (citing *Heien v. North Carolina*, 574 U.S. ---, 135 S. Ct. 530 (2014)).

34

A.    Duty to Submit to a Blood Test

[¶48]  In this case, the police officer used Maine's implied consent form to advise LeMeunier-Fitzgerald of her duty to submit to a blood test for the purpose of determining her blood alcohol level.  The Court, however, addresses only a portion of the implied consent form that the officer read to the defendant.  Court's Opinion ¶ 4.  The police officer also read the following portion of the form to LeMeunier-Fitzgerald:

> By operating or attempting to operate a motor vehicle in this State[,] you have a duty to submit to and complete chemical tests to determine your alcohol level and drug concentration.

[¶49]  This language in the form, which pre-dated *Birchfield*, applied to "chemical tests": both breath and blood tests.  *Birchfield* changed everything with regard to blood tests—and Maine's implied consent form should no longer state that defendants have a "duty" to submit to a blood test.  *See Birchfield v. North Dakota*, 579 U.S. ---, 136 S. Ct. 2160, 2185 (2016) (concluding "that a breath test, *but not a blood test*, may be administered as a search incident to a lawful arrest for drunk driving") (emphasis added).  *Birchfield* now requires law enforcement to obtain a search warrant to extract blood from a defendant for purposes of a blood test to determine the alcohol level of the defendant.  *Id.* at 2184.

[¶50]  The United States Supreme Court and this Court have recognized exceptions to the warrant requirement.  *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459 (2011); *State v. Boyd*, 2017 ME 36, ¶ 8, 156 A.3d 748.  Consent by the defendant is a well-recognized exception to the need for search warrants.  *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  The pivotal issue in this case is whether LeMeunier-Fitzgerald voluntarily gave her consent to the taking of her blood.  There is a great deal of jurisprudence setting out how we evaluate whether a defendant has voluntarily consented to a warrantless search.  *See, e.g.*, *State v. Nadeau*, 2010 ME 71, ¶¶ 17, 56, 1 A.3d 445; *State v. Bailey*, 2010 ME 15, ¶¶ 22-24, 989 A.2d 716; *State v. Faulkner*, 586 A.2d 1246, 1247 (Me. 1991); *State v. Fredette*, 411 A.2d 65, 68 (Me. 1979); *State v. McLain*, 367 A.2d 213, 216-17 (Me. 1976); *State v. Barlow*, 320 A.2d 895, 899 (Me. 1974).

[¶51]  Citing *Barlow*, among other sources of law, the Court acknowledges that consent cannot be voluntary if it is induced by misrepresentation.  Court's Opinion ¶¶ 22, 32.  The *Barlow* Court, citing to Supreme Court precedent, explained "that a search cannot be justified as reasonable and lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted an alleged

authoritative right to search." *Barlow*, 320 A.2d at 900 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)). In *Barlow*, this Court specifically said that,

> [w]here an officer . . . conveys to the defendant by affirmative misrepresentations that he has the right to search without a warrant as in the instant case, the defendant's consent to the search given in response to such false assertions must be regarded as the mere submission of a law-abiding citizen to an officer of the law and cannot be construed as a valid waiver of [her] constitutional rights against an unreasonable search and seizure.

320 A.2d at 900.

[¶52] Here, *Birchfield* compels us to conclude that the implied consent warning stating that a defendant has a duty to submit to a chemical test to determine her alcohol level is a misrepresentation of the law. This is no different than the police officers in *Barlow* who told the defendant that they had the right to search without a warrant. *See Barlow*, 320 A.2d at 898-99. Both involved misrepresentations of the law intended to overcome a defendant's right to withhold consent to a search. In light of *Birchfield*, LeMeunier-Fitzgerald did not have a duty to take a blood test; she had an absolute right to *refuse to consent* to a blood test. *See Birchfield*, 569 U.S. at ---, 136 S. Ct. at 2186. Therefore, just as the threat of an enhanced criminal penalty is coercive as a matter of law, a police officer's statement that a defendant has

a "duty to submit to and complete chemical tests to determine . . . alcohol level and drug concentration" is coercive as a matter of law.

B.      Comment on Evidentiary Consequences of Refusal

[¶53]  The second statement made to the defendant also constitutes a misrepresentation of the law.  The police officer, again reading from Maine's implied consent form, stated to LeMeunier-Fitzgerald:

> Your failure to submit to a chemical test is admissible against you at any trial for operating while under the influence of intoxicating liquor or drugs.

Because *Birchfield* gives a defendant the constitutional right to refuse to submit to a blood test, informing LeMeunier-Fitzgerald that if she refused, that refusal would be admissible against her at trial, was a misrepresentation of the law, and thus coercive.

[¶54]  We recently held in *State v. Glover* that the State may not comment on a defendant's failure to give consent to a search.  *See* 2014 ME 49, ¶¶ 16-17, 89 A.3d 1077.  In *Glover*, the defendant exercised his constitutional right not to submit to a warrantless DNA test, and the State repeatedly referenced Glover's refusal to consent to the warrantless search.  *Id.* ¶ 14.  Relying on the principle that the "value of constitutional privileges is largely destroyed if persons can be penalized for relying on them," *id.* ¶ 13 (quotation marks omitted), we

"conclude[d] that the manner in which Glover's exercise of a constitutional right was used to penalize him at trial [was] fundamentally unfair and contrary to the principles of justice that encourage the free exercise of constitutional rights," *id.* ¶ 16.

[¶55]  After *Glover,* telling a defendant that the prosecution will use her refusal against her if she does not agree to the blood test is a significant misrepresentation of the law.  Ultimately, it is not important what could happen at trial; it is the misrepresentation of the law at the time of the inducement of consent that is of import.  When an officer misrepresents the law and allows the defendant to believe that any refusal to consent will be used against her at trial, the misrepresentation is inherently coercive.

[¶56]  I would hold that it was coercive as a matter of law to tell LeMeunier-Fitzgerald the following three things: (1) that she would face an enhanced criminal penalty for refusal to submit to a blood test, (2) that she had a "duty to submit" to the blood test, and (3) that any evidence of her refusal would be admissible against her in a trial.  The State's implied consent form should be modified to remove the language that misrepresents the law in light of *Birchfield*.

HJELM, J., dissenting.

[¶57]  I join Justice Gorman in her dissent from the Court's conclusion that no coercion results from a law enforcement officer's statement to a driver that, if she is ultimately convicted of OUI, her failure to submit to a blood draw would subject her to an enhanced criminal penalty—including a minimum mandatory jail term.  I part ways with Justice Gorman's analysis only on the issue of the legal and procedural consequences of our mutual conclusion that the officer's duty-to-submit warning was coercive.  In my view, the coercion resulting from the warning given to LeMeunier-Fitzgerald does not render her submission to the blood draw involuntary as a matter of law.  Rather, the coercive effect of the warning is one factor within the totality of the circumstances that the trial court must consider in its voluntariness analysis.  For that reason, I would remand the matter for the court to reconsider the issue of whether LeMeunier-Fitzgerald's submission to the blood draw ultimately was voluntary.

[¶58]  In the face of LeMeunier-Fitzgerald's challenge to the admissibility of evidence obtained from the blood sample, the State bore the burden of proving that her consent to the search that produced the blood sample "was, in

40

fact, freely and voluntarily given." *State v. Bailey*, 2010 ME 15, ¶ 22, 989 A.2d 716 (quotation marks omitted). It is a basic principle of law that when an accused challenges the voluntariness of a consent to search, a court is to adjudicate the issue based on the totality of the circumstances.[17] *See, e.g., Birchfield v. North Dakota*, 579 U.S. ---, 136 S. Ct. 2160, 2186 (2016); *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (explaining that voluntariness of a consent to a search is "a question of fact to be determined from all the circumstances" (quotation marks omitted)); *Schneckloth v. Bustamonte*, 412 U.S. 218, 224-26 (1973) (explaining that voluntariness is determined by an assessment of "the totality of all the surrounding circumstances" and does not "turn[] on the presence or absence of a single controlling criterion"); *United States v. Trueber*, 238 F.3d 79, 95 (1st Cir. 2001) ("The question of voluntariness [of consent to a search and questioning] is a question of fact determined by the totality of the circumstances."); *State v. Marquis*, 2018 ME 39, ¶ 17, 181 A.3d 684 ("The determination of consent is a mixed question of fact and law to be determined

---

[17] The same principle applies to the issue of voluntariness in other contexts, such as statements to law enforcement. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 433-34 (2000) ("The determination [of voluntariness of a confession] depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." (quotation marks omitted)); *United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000) ("To determine the voluntariness of a waiver [of *Miranda* rights], it is necessary to look at the totality of the circumstances . . . ."); *State v. Hunt*, 2016 ME 172, ¶¶ 19-22, 151 A.3d 911 (explaining that voluntariness of a confession is determined by examining the totality of the circumstances).

from all the circumstances existing at the time of the search."); *Bailey*, 2010 ME 15, ¶¶ 23-24, 989 A.2d 716 ("As with other factors bearing on voluntariness, whether a misrepresentation of the purpose of a search by the police invalidates consent is a question of fact based on the totality of the circumstances."); *State v. Barlow*, 320 A.2d 895, 899 (Me. 1974) ("Whether a given consent to a search in a particular case was in fact voluntary or the product of duress, coercion, express or implied, is a question of fact to be determined from the totality of all the surrounding circumstances.").

[¶59] Here, despite the lessons of *Birchfield*, the court failed to assign *any* coercive effect to the mandatory minimum sentence-related information given by the officer to LeMeunier-Fitzgerald. For the reasons explained in Justice Gorman's dissent, the court's analysis was erroneous. That error, however, is not dispositive and does not warrant the conclusion as a matter of law that the challenged evidence must be excluded. This is because evidence of coercion arising from the duty-to-submit warning is but one element—albeit potentially a significant one—within the universe of circumstances revealed by the evidence presented at the motion hearing. Indeed, although the parties stipulated to certain facts, including the content of the refusal-related warnings provided to LeMeunier-Fitzgerald, the State also presented testimony from the

officer describing "the scene" at the hospital, where the officer informed her of the consequences of a refusal. In that testimony, the officer described LeMeunier-Fitzgerald's demeanor during his interactions with her, her conduct, and other factual matters such as her execution of a medical release form. All of this information is material to reveal the broader context in which LeMeunier-Fitzgerald decided to submit to the blood draw and which the court must consider—in conjunction with the coercive warning—when evaluating the voluntariness of that decision.

[¶60] In *Birchfield*, after determining that the implied consent warnings were improper, the Court remanded the Beylund matter for the trial court to reconsider whether, based on the totality of the circumstances and notwithstanding the coercive effect of the warnings, Beylund's consent was voluntary. 579 U.S. ---, 136 S. Ct. at 2186-87. In my view, the same situation exists here. Because the trial court committed legal error in its treatment of the warnings, I would remand the matter for the court to reconsider whether, based on the totality of the circumstances that includes the coercion created by the duty-to-submit warning—the State has proved that LeMeunier-Fitzgerald voluntarily submitted to the blood draw.

Jamesa J. Drake, Esq. (orally), and Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, and Darrick X. Banda, Esq., Law Offices of Ronald W. Bourget, Augusta, for appellant Lyanne Lemunier-Fitzgerald

Maeghan Maloney, District Attorney, and Kate E. Marshall, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Tyler J. Smith, Esq., Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for amicus curiae Maine Association of Criminal Defense Attorneys

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Department of the Attorney General, Augusta, for amicus curiae Department of the Attorney General

Kennebec County Unified Criminal Docket docket number CR-2016-222
FOR CLERK REFERENCE ONLY