**STATE of Maine**

**v.**

**Vance J. FARMER.**

Supreme Judicial Court of Maine.

Aug. 27, 1974.

Charles H. Veilleux, County Atty., Skowhegan, for plaintiff.

Perkins & Townsend by Clinton B. Townsend, Skowhegan, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

Russell Landry, Jr. was employed by the Town of Norridgewock as a truck driver. One of his truck-driving duties during the winter months was to operate a snowplow to assist in snow removal from the streets of the town. The plow consisted of a single angled blade (in contrast to an inverted "V" blade) attached to a cab and truck-body unit, and resting on the truck body immediately behind the cab almost entirely shielding the back of the cab was a steel

"wingbox" or "sandguard" containing a horizontal slit to enable the operator, seated in the cab, to see to the rear.

Included within Landry's route for snowplowing was a street, "Old Madison Road", on the westerly side of which stood the house of the defendant, Vance J. Farmer. A garage owned by defendant was situated on the easterly side of the street. Landry's practice in snowplowing was to proceed in a northerly direction on Old Madison Road, going on a first pass by defendant's house and continuing for several hundred yards northerly on Old Madison Road, then to turn around and travel in a southerly direction in a second pass by defendant's house. Usually, as Landry made his first (northerly) pass by defendant's house, his plowing would cause the driveway to defendant's garage to become full of snow.

Defendant believed that Landry could plow without causing a pile-up of snow in the garage driveway, and on at least two occasions defendant had so informed Landry and had explicitly requested him to avoid piling snow in the garage driveway.

On December 31, 1971 there was a fresh snowfall of 4 to 5 inches. Landry was plowing in the vicinity of defendant's house and happened to make his first pass by defendant's house while Timothy Paine, a thirteen year old boy who was living with the defendant, was standing in the garage driveway near the street shoulder. As Landry drove by, the blade of the plow threw snow in an amount and with force sufficient to knock Timothy off his feet. Timothy arose, ran at once to defendant's house and reported the incident to the defendant.

Defendant became extremely angry. He fetched his shotgun and stood in the front doorway of his house. As Landry was on his return (southerly) pass and had gone beyond defendant's house, defendant shouted curses at Landry and fired three shots toward the truck. Landry did not see defendant fire but heard the shots. He continued a short distance southerly beyond defendant's house and stopped to examine the rear of the truck. He found several fresh markings on the body and a broken taillight. (The next day when Landry repaired the taillight he found a lead pellet inside of it, and he delivered the pellet to the Norridgewock Chief of Police).

After he had finished plowing, Landry reported the shooting incident to the police. The Norridgewock Chief of Police and the Sheriff of the County, Francis B. Henderson, accompanied by Landry, went to defendant's house. Defendant came to the door and one of the officers asked defendant if he was the "proud owner of a shotgun." Defendant, without hesitation, replied that he was.

There ensued some further discussion on which the record is somewhat confusing. It is clear in the record, however, that defendant invited the officers and Landry into his house, and soon one of the officers mentioned defendant's dissatisfaction with Landry's snowplowing technique. Acknowledging that he was disturbed about it, defendant was preparing to discuss it in more detail when he was interrupted to be given "Miranda" warnings. Defendant asserted that he knew his "rights" but the officers persisted in reading the "Miranda" warnings to him. Sheriff Henderson then asked defendant if his shotgun was in the house. Defendant answered that it was and forthwith took the Sheriff to the location of the gun. Defendant thereupon removed the gun from a drawer and delivered it to Sheriff Henderson. The Sheriff then arrested defendant, and defendant was taken to the police station.[1]

On January 9, 1973 defendant was indicted in the Superior Court (Somerset

---

1. Defendant testified that he thought that he was not being "arrested" but was going to the police station only for a further discussion of all of his problems connected with Landry's snowplowing. The Sheriff testified that he had made a custodial arrest of defendant.

County) for having violated 17 M.R.S.A. § 201–A.[2]  The indictment charged:

"That on or about the thirty-first day of December 1972, in the Town of Norridgewock, County of Somerset, and State of Maine, the above named defendant, Vance J. Farmer, being armed with a firearm, to wit: a shotgun, unlawfully did attempt to strike, hit, touch, or do violence to one Russell Landry, Jr., in a wanton, willful and angry manner, having an intention and existing ability to do violence to the said Russell Landry, Jr."

After a jury trial defendant, on January 24, 1973, was found guilty as charged and sentenced to serve two to four years in the Maine State Prison.  Defendant has appealed from the judgment of conviction.

The points defendant raises on appeal were precipitated by the following events.

Prior to trial defendant had moved to dismiss the indictment claiming 17 M.R.S. A. § 201–A to be unconstitutional on its face because its provisions (1) establish "cruel and unusual" punishment in violation of the Constitutions of Maine and the United States, (2) deny the "equal protection of the laws" in violation of said Constitutions and (3) contravene the "separation of powers" mandated by the Maine Constitution.

Also prior to trial defendant had moved to suppress, as evidence against him, the shotgun which defendant had delivered to Sheriff Henderson on the ground that the Sheriff's accepting and retaining, possession of the shotgun was a "seizure" violative of the Fourth-Fourteenth Amendments to the Constitution of the United States.

These pre-trial motions of defendant were denied by the Justice presiding in the Superior Court and, on appeal, defendant assigns the rulings as reversible error.

After trial had commenced defendant moved to dismiss the indictment.  Defendant claimed fatal deficiency in the indictment for failing to allege *that, and the manner in which,* the shotgun (alleged in the indictment to be the "firearm" involved) was *used* to commit the underlying "assault" charged.  The motion was denied, and defendant on appeal claims this ruling to be error requiring reversal of the judgment of conviction.

During the further course of trial, defendant objected to the admission into evidence of the lead pellet identified in testimony as having been found in the taillight of the snowplow.  The ground of objection was that the evidence failed to establish a continuity of possession sufficient to warrant a reliable identification.  The presiding Justice's admission of the pellet into evidence is asserted by defendant on appeal to be error sufficiently prejudicial to invalidate the judgment of conviction.

When the State had completed presentation of its evidence, defendant moved for a judgment of acquittal (Rule 29(b) M.R. Crim.P.)  The motion was denied, and defendant went forward with his own case including defendant's taking the stand to offer testimony in his own behalf.  Although defendant did not renew his motion for judgment of acquittal at the conclusion of all the evidence and after the return of the jury's verdict failed to file either a motion for judgment of acquittal under Rule 29(b) M.R.Crim.P. or a motion for a new trial under Rule 33 M.R.Crim.P., defendant

2.  17 M.R.S.A. § 201–A provides as follows: "Whoever, if armed with a firearm, unlawfully attempts to strike, hit, touch or do any violence to another, however small, in a wanton, willful or angry or insulting manner having an intention and existing ability to do some violence to such person, is guilty of an armed assault.  If such attempt is carried into effect, he is guilty of an armed assault and battery.  Any person convicted of either offense shall be punished by imprisonment for not less than 2 nor more than 25 years.  The imposition or execution of a sentence for a violation of this section shall not be suspended and probation shall not be granted."

nevertheless asserts as one of his points on appeal that the judgment of conviction must be reversed because of the insufficiency of the evidence to support it.

We deny the appeal.

## 1

We consider, first, defendant's attack on the indictment.

Insofar as the indictment alleged expressly that the "firearm" involved was a "shotgun", the issue becomes narrowed to whether the indictment sufficiently alleges that defendant was "armed." Defendant's contention is that because the indictment states only that defendant was "armed" (with a shotgun) and fails to allege *that, and the manner in which,* the defendant made *a use* of the shotgun to assist in the commission of the "assault" charged, it is fatally deficient. Defendant maintains that whereas in common parlance the word, "armed", is broad enough to signify that one is "armed" who has possession or control of an instrument thus to have it available for offensive or defensive use as a weapon, in 17 M.R.S.A. § 201–A "armed" has the more restricted meaning that the instrument must in some manner be used as a weapon to assist in the commission of the foundational "assault." Hence, contends defendant, the indictment's reliance *solely* on the word, "armed", renders the indictment fatally deficient as subject to a reasonable interpretation that conduct of the defendant which vis-a-vis 17 M.R.S.A. § 201–A is innocent conduct might be the gravamen of the accusation against defendant.

■ By this argument defendant misconceives the meaning of "armed" in 17 M.R.S.A. § 201–A as applicable to the specific context before us in which defendant is charged to be "armed" with a *real gun.* A person who commits an assault while he has in his possession or control a *real gun* available to him for use, offensively or defensively, as a weapon, and even if such real gun is not in any respect used in the commission of the assault, is, within the intendment of 17 M.R.S.A. § 201–A, committing the assault while "armed" (with a "firearm.")[3] This interpretation accords with the meaning attributed by the general current of authority to the concept, "armed", in similar contexts. People v. Hall, 105 Cal.App. 359, 287 P. 533 (1930); Curl v. State, 40 Wis.2d 474, 162 N.W.2d 77 (1969); State v. Herkshan, 105 Ariz. 394, 465 P.2d 587 (1970); See: People v. Anderson, 236 Cal.App.2d 419, 46 Cal.Rptr. 1, 10 (1965). Cf. State v. Lynch, 88 Me. 195, 33 A. 978 (1895).

■ With 17 M.R.S.A. § 201–A thus interpreted, the present indictment's charge that defendant was "armed" with a real gun sufficiently informs defendant, according to the reasonable meaning of words in the English language, that defendant is accused of *only* such conduct, *and no other,* as is delineated criminal by 17 M.R.S.A. § 201–A. Defendant is thus adequately alerted to be able

"to defend and, upon conviction or acquittal, to make use of the judgment as a

---

3. By P.L.1971, Chapter 539, effective September 23, 1971, "firearm", as used throughout Title 17 of the Revised Statutes, is defined to " . . . include any . . . instrument that has the appearance of a firearm [as otherwise defined] even though not capable of discharging a projectile."

Because of this inclusion, and with particular reference to the crime of "assault" involved in 17 M.R.S.A. § 201–A, it may be that an indictment which omits to state that a *real* "firearm" (as otherwise defined) is involved, or alleges affirmatively that the "firearm" involved is an instrument having the "appearance of a firearm" (as otherwise defined), becomes fatally deficient on the ground that a reasonable interpretation of the meaning of "armed" in 17 M.R.S.A. § 201–A in specific relation to an instrument merely having the "appearance of a firearm" necessitates that such instrument be somehow used to aid in the commission of the assault.

Our suggestion of this potential issue not presently before us is no intimation of the appropriate resolution of it should it arise in a future case.

basis of a plea of former jeopardy, should the occasion arise." State v. Chick, Me., 263 A.2d 71, 75 (1970)

Also: State v. Vane, Me., 322 A.2d 58 (1974); State v. Thibodeau, Me., 317 A.2d 172 (1974); State v. Bull, Me., 249 A.2d 881 (1969); State v. Charette, 159 Me. 124, 188 A.2d 898 (1963); State v. Strout, 132 Me. 134, 167 A. 859 (1933); State v. Doran, 99 Me. 329, 59 A. 440 (1904).

The presiding Justice acted without error in denying defendant's motion to dismiss the indictment.

## 2

The contention of defendant that Sheriff Henderson's accepting, and retaining, possession of the shotgun delivered to him by defendant was a "seizure" which violated the federal Fourth–Fourteenth Amendments rests on defendant's view that his apparent "consent" to the transaction was not truly "voluntary" but was defendant's submission to a coercion created by an overall interchange between law enforcement officials and defendant.[4]

Defendant's position must be rejected.

Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) establishes that since the policy objectives behind the Fifth Amendment to the Constitution of the United States differ substantially from those underlying the Fourth Amendment, the "Miranda" prophylactic *per se* approach operative in Fifth Amendment "privilege against self-incrimination" contexts is inapplicable to situations involving Fourth Amendment "search and seizure" protections. Under Schneckloth v. Bustamonte the "voluntariness" of the "consent" validating a warrantless "search and seizure" (which, absent such consent would otherwise contravene the federal Fourth–Fourteenth Amendments) is as-

sessed by all the particular facts and circumstances of each situation rather than upon the principle that any single factor is *per se, or universally, controlling.* Also: United States v. Rothman, 492 F.2d 1260 (9th Cir. 1973); United States v. Heimforth, 493 F.2d 970 (9th Cir. 1974); State v. Barlow, Me., 320 A.2d 895 (1974).

Here, defendant was not under police custody when he saw fit to take the Sheriff to the location of the shotgun and to deliver possession of it to the Sheriff. At all times, defendant was not only willing but anxious to present to the officers all of the details of his version of his continuing dispute with Landry and the manner in which Landry plowed snow. Further, even though defendant was not under their custodial control and professed to know his constitutional rights, the officers took precautions to ensure that defendant was told the "Miranda" warnings. Against this circumstantial backdrop, defendant not yet being under custodial control of the officers and having been amply and specially warned concerning his privilege against self-incrimination and the prophylactic measures by which the protections it affords are implemented, Sheriff Henderson made an inquiry of defendant whether defendant was willing to take him to the place where defendant had the shotgun. Defendant unhesitatingly acceded, showing the Sheriff the location of the shotgun and himself handing the shotgun to the Sheriff. At this time, and even subsequently, it was defendant's own subjective evaluation of the situation that he was not under actual police control or custody or in immediate danger of it—defendant having testified that even when he was on his way to the police station in the company of the police officers, his own belief was that he was going to the police station only for further discussion of his problems with Landry and the snowplow.

4. As mentioned ante, defendant raised this issue by a pre-trial motion to suppress the shotgun as evidence against him. He further preserved the contention by reasserting it at trial as part of an objection to the admissibility of the shotgun as evidence. The shotgun was allowed into evidence over such "at-trial" objection of defendant.

A holding that this total circumstantial pattern projects an official coercion vitiating the voluntariness of defendant's consent would be tantamount to a conclusion that any conduct of an average lay person in the presence of police officers who are asking questions is *automatically and per se* a submission to a coercion exerted by official authority. Schneckloth v. Bustamonte, supra, discloses definitively, that such is not the law.

■ The presiding Justice committed no error in ruling that in the total circumstances here involved defendant's taking the Sheriff to the place of the gun and delivering it to the Sheriff was defendant's voluntary consent to the Sheriff's receiving, and retaining, possession of the shotgun; and, therefore, such warrantless "seizure" of the shotgun, since it was with defendant's consent, was consistent with federal constitutional requirements of the Fourth–Fourteenth Amendments.

### 3

We conclude that in each respect in which defendant contends that the penalty provisions of 17 M.R.S.A. § 201–A render the statute unconstitutional on its face defendant's argument is unsound.

■ Defendant maintains that Section 201–A imposes "cruel and unusual" punishments—"cruel" because imprisonment for so long a time as at least two years is required and "unusual" because the legislative *mandate* of imprisonment, denying discretion to the sentencing Judge to suspend the imposition or execution of sentence and grant probation, is a marked deviation from our society's now well-established attitudes concerning the punishment of felons.

We reject the contention.

The only authority mentioned by defendant to suggest support for his position is Mottram v. State, Me., 263 A.2d 715 (1970) in which, after having quoted from Duncan v. Ulmer, 159 Me. 266, 284, 191 A.2d 617, 626 (1963) that the inflicting of cruel and unusual punishment

"'implies something inhumane and barbarous, or, some punishment unknown at common law'",

this Court concluded that a "recidivist" statute which "permits—but does not require—greatly enhanced punishment for recidivists in appropriate cases" imposes no cruel and unusual punishments. Defendant argues that in thus differentiating between punishment legislatively *authorized* (with usual discretion allowed to the sentencing Judge) and punishment legislatively *mandated* (in which the sentencing Judge is denied the discretion usually open to him), Mottram v. State indicates that the requirement in Section 201–A that

"[t]he imposition or execution of a sentence . . . shall not be suspended and probation shall not be granted"

as to a confinement legislatively *commanded to be for so long as a minimum of two years* is "cruel and unusual" punishment.

Defendant's contention is erroneous. It reads into Mottram v. State a conclusion neither explicitly considered nor intended by this Court and which is unjustified in principle. In State v. Allen, Me., 235 A.2d 529 (1967), even as we acknowledged that by the common law the judiciary may have a degree of authority in the premises, we nevertheless emphasized that

"[t]he power to suspend execution of sentence imposed upon one convicted of a criminal offense, to grant probation and . . . subsequently revoke it, *is largely a statutory matter,* state or federal." (p. 530) (emphasis supplied)

See also: State v. Blanchard, 156 Me. 30, 41–46, 159 A.2d 304 (1960).

■ Thus conceived, judicial authority to suspend the imposition or execution of sentence, and grant probation, continues subject to divestment by legislative action

rationally directed to the promotion of the public safety or welfare. That, historically, the Legislature may have invoked this facet of its police power only infrequently does not cause the exercise of it at a given time and as to particular felonies, or felonies in general, to become *per se* the imposition of "unusual" punishment in any sense violative of constitutional guarantees against "cruel and unusual" punishments. Neither does the Legislature's denial of discretion to the judiciary to suspend the imposition or execution of a sentence of imprisonment, and grant probation, in any felony case become constitutionally prohibited "cruel" punishment solely because the period of imprisonment mandated is as long as a minimum of two years. See: United States v. Kleinzahler, 306 F.Supp. 311, 317 (D.C.1969); United State v. Carol, 328 F.Supp. 894, 895 (D.C.1971); cf: United States v. Donovan, 242 F.2d 61 (2nd Cir. 1957).[5]

■ We find without merit defendant's contention that the mandatory sentencing provisions of 17 M.R.S.A. § 201–A contravene the State and federal constitutional guarantees of the "equal protection of the laws." The argument rests on defendant's assumption that in selecting "firearms" as a solitary factor upon which to predicate the mandatoriness of imprisonment and ignoring the many other kinds of weapons which are also in common use and are highly dangerous, the Legislature acted irrationally. Defendant's premise is erroneous. The Legislature does not perpetrate invidious discrimination if, in confronting a multitude of evils, it has reason to direct attention to only one of them as most urgently requiring remedial action. Skinner v. Oklahoma, 316 U.S. 535, 62 S. Ct. 1110, 86 L.Ed. 1655 (1942). The Legislature was not irrational in singling out the "firearm" for particularized attention

since its projectile capability which enables it to kill or wound from a distance makes it a weapon of specially enhanced dangerousness.

■ We reject defendant's claim that 17 M.R.S.A. § 201–A violates the separation of powers mandated by the Constitution of Maine. The short, and definitive, answer to defendant's argument derives from a point already clarified:—that the authority of the judiciary to suspend the imposition or execution of sentence, and grant probation, derives fundamentally from statute (ante at p. 745). We should be guilty of a non-sequitur were we to conclude that because the Legislature has for a long time authorized judges to sentence criminal offenders and to have a broad discretion in the process, the power to sentence criminal offenders, including as incident to it a large judicial discretion, becomes transformed into a power inherently judicial. Similarly fallacious would be a conclusion that because the Legislature may have seen fit at any given period of time to confer upon judges particular sentencing discretion, the Legislature has lost its authority subsequently to divest it should divestment be found in the public interest.

*4*

Defendant's remaining points of appeal require less extensive discussion for their disposition.

■ Defendant says that the lead pellet offered by the State and identified by Landry in Court as the pellet he had found in the taillight of the truck was improperly admitted as evidence since the absence of an identified continuity of possession creates reasonable doubt as to the acceptability of Landry's identification. Even if such reasonable doubt be assumed, we find no

---

5. By thus deciding that two years is an insufficiently lengthy period of mandatory imprisonment to be "cruel and unusual" punishment for a particular felony, or felonies in general, we intend no suggestion concerning how long an imprisonment mandatorily prescribed will, if at all, be held constitutionally deficient in this regard.

cause for reversal. In this facet of the case the critically material point was *that* Landry had found *a* shotgun pellet at a particular time and place. Since Landry had directly testified that on the day following the shooting he had in fact found a pellet in the taillight, the introduction of the pellet into evidence was significant only as tending to corroborate Landry's testimony. Defendant, himself, however, had testified that he had fired three shots toward the truck operated by Landry and thus provided so overwhelming a corroboration of Landry's testimony that any erroneously permitted additional corroboration created by the lead pellet's being admitted into evidence was plainly harmless.

■ Defendant's claim that the evidence is legally inadequate to support the conviction was not properly preserved for appellate cognizance. Defendant's motion for judgment of acquittal filed at the conclusion of the State's case was waived when, after the presiding Justice denied the motion, defendant proceeded to offer evidence in his own behalf. State v. Morton, Me., 290 A.2d 371 (1972); and since defendant failed to file a motion for judgment of acquittal either at the conclusion of all of the evidence or within the appropriate time after verdict (under Rule 29(b) M.R. Crim.P.) or a motion for a new trial under Rule 33 M.R.Crim.P. (which, as provided in Rule 29(b), would encompass a motion for judgment of acquittal as an alternative), the issue of the sufficiency of the evidence was never appropriately saved in the trial Court to be open to appellate review in due course. State v. Call, Me., 322 A.2d 64 (1974); State v. Gamage, Me., 301 A.2d 347 (1973).

■ Yet, since defendant has explicitly designated the inadequacy of the evidence as a point purportedly raised on appeal, and State v. Gamage, supra, indicates that in "exceptional circumstances" this Court may see fit to act "to prevent manifest injustice", we note that we have carefully reviewed the evidence and are satisfied that on all of the evidence adduced the jury caused no injustice to defendant in finding him guilty of the crime charged against him.[6]

The entry is:

Appeal denied.

All Justices concurring.

---

6. Defendant's claim that the evidence was insufficient to authorize a jury conclusion that defendant specifically intended to do violence to Landry, rather than generally to vent anger, is unfounded since the jury need not have accepted defendant's disclaimer of subjective intent and was entitled to rely upon defendant's cursing at Landry as defendant fired three shots toward the truck operated by Landry as sufficient evidence that it was defendant's intention to cause harm to Landry. State v. Rand, 156 Me. 81, 161 A.2d 852 (1960); State v. Cuccinello, 152 Me. 431, 133 A.2d 889 (1957); State v. Sanborn, 120 Me. 170, 113 A. 54 (1921).

Defendant's argument that the failure of the evidence to show that the shotgun introduced into evidence was capable of discharging a projectile precludes a valid conviction of defendant is frivolous since in his own testimony defendant admitted that he had used the shotgun which had been introduced into evidence to fire three shots toward the truck operated by Landry.

The third contention of defendant that the evidence was inadequate to show "existing ability" of defendant to do violence to Landry because the steel "wingbox", or "sandguard", which was situated behind the cab provided an impenetrable barrier must be rejected in light of the evidence that there was a horizontal space in the steel sufficient to allow the truck operator to have vision to the rear of the cab—the jury being entitled to find from this evidence that pellets fired from the shotgun used by defendant could enter the cab through this space and cause injury to Landry.