MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2019 ME 61
Docket:      Ken-18-191
Argued:      February 7, 2019
Decided:     April 23, 2019

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

CADE H. AYOTTE

HUMPHREY, J.

[¶1] Cade H. Ayotte appeals from a judgment of conviction of operating under the influence (Class D), 29-A M.R.S. § 2411(1-A)(A) (2018), entered by the trial court  (Kennebec County, *Murphy, J.*) following a jury trial.  Ayotte asserts that the court erred by denying his motion to suppress evidence obtained from a blood draw and by failing to issue a curative instruction to remedy the State's alleged misstatement of the evidence in its closing argument.  We affirm the judgment.

I.  BACKGROUND

[¶2] When the evidence is viewed in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt.  *See State v. Simons*, 2017 ME 180, ¶ 2, 169 A.3d 399.  Early in the

morning on June 25, 2016, Augusta police officers responded to a motor vehicle crash. When the officers arrived, they observed tire tracks leading into a ditch, a vehicle engulfed in flames, and Ayotte and his girlfriend walking across the road. When one officer spoke with Ayotte, the officer detected an odor of alcohol and observed that Ayotte's eyes were dilated; Ayotte admitted to having operated the vehicle.[1] Because Ayotte appeared injured, officers transported him in a cruiser to the hospital in Augusta for medical attention rather than conducting field sobriety tests at the scene. A sample of Ayotte's blood was drawn at the hospital about one hour and fifteen minutes after the crash; the results of the blood draw indicated a blood-alcohol content of .078 grams of alcohol per 100 milliliters of blood, with a margin of error of .005 grams.

[¶3] Prior to the trial, Ayotte filed a motion to suppress evidence from the blood draw and the corresponding blood-alcohol test result, arguing that the evidence was obtained without valid consent. Ayotte testified at the suppression hearing that medical staff diagnosed him with a concussion and that his memory of the incident and subsequent police interactions was "foggy" and "patchy, at best." He also testified that he felt that the officers had used the

---

[1] The officers testified that, when asked, Ayotte rated himself a "5" on a scale of intoxication of 1-10, and he gave varying accounts of how much alcohol he had consumed that evening and what time he had had his last drink.

concern he expressed about his girlfriend, who also had sustained injuries in the accident and was transported separately to the hospital by ambulance, to "pressure" him into signing the consent forms. The court denied the motion, finding that Ayotte's testimony about decisions he had made regarding his medical care demonstrated that he had the capacity to make knowing decisions and act in accordance with them, that the officer had reviewed the requisite consent forms with Ayotte, and that Ayotte had signed the forms freely and voluntarily. *See State v. Palmer*, 2018 ME 108, ¶ 2, 190 A.3d 1009.

[¶4]  At trial, the State presented as an expert witness a chemist from the State Health and Environmental Testing Laboratory, who opined that Ayotte's blood-alcohol content had been greater than .08 at the time the crash occurred. The chemist described a chemical analysis he performed called "reverse extrapolation" (RE), which is used to estimate a person's blood-alcohol content at a given time prior to the taking of the test sample. On cross-examination, Ayotte questioned the reliability of the expert's RE analysis by introducing a 1985 article by Dr. Kurt Dubowski, an article the State's expert acknowledged is an accepted authority in the field of analytical chemistry.

[¶5]  During closing arguments, the prosecutor characterized two RE techniques described in the Dubowski article—the use of sweat pads and saliva

samples to determine a person's level of intoxication—as "outdated." Ayotte timely objected and argued that the "outdated" reference was a mischaracterization of the article and was not supported by the chemist's testimony. The State responded that it was not commenting on the underlying scientific validity of the article itself, but rather drawing on the expert's testimony that sweat pads and saliva sampling techniques were not used in the State's lab and had not been used in Maine in thirty years. Ayotte requested a curative instruction that the State's characterization of the Dubowski article as "outdated" was not supported by the evidence or that the jury should disregard the characterization. The court declined to give an instruction, noting that giving that instruction would amount to "injecting evidence into the record." The court did, however, issue the standard instruction that the attorneys' statements are not evidence; the jury alone decides how much weight to give expert's testimony; and if a juror thinks an attorney has misstated the evidence or overstated the evidence, it is the juror's recollection of the evidence and not the attorney's that the juror should consider.

[¶6] The jury found Ayotte guilty of operating under the influence (Class D) 29-A M.R.S. § 2411(1-A)(A). The court entered a judgment on the verdict, sentencing him to five days in jail, a $500 fine, and a 425-day loss of

license, which included an additional mandatory suspension of 275 days because his passenger was under the age of twenty-one. 29-A M.R.S. § 2411(5)(G) (2018). Ayotte appeals.

## II. DISCUSSION

[¶7] On appeal, Ayotte argues that the court erred by denying his motion to suppress because his consent to the blood draw was not knowing and voluntary, and by declining to give a curative instruction at trial because the State's reference to the Dubowski article constituted prosecutorial misconduct.

### A. Consent

[¶8] Withdrawing blood for the purpose of determining its alcohol content is a search under the Fourth Amendment, and therefore requires a warrant or the existence of an exception to the warrant requirement, such as consent.[2] U.S. Const. amend. IV; *State v. LeMeunier-Fitzgerald*, 2018 ME 85, ¶¶ 11-12, 21, 188 A.3d 183. When consent is challenged, the State carries the burden of showing, by a preponderance of the evidence, that a person's consent was knowingly and voluntarily obtained. *Id*. ¶ 21; *see also State v. Bailey*, 2012 ME 55, ¶ 16, 41 A.3d 535. We review a court's factual findings regarding

---

[2] The parties stipulated at the suppression hearing that there were no exigent circumstances for the blood draw.

6

whether consent was given for clear error, and the ultimate question of whether an individual consented to the search de novo. *State v. Nadeau*, 2010 ME 71, ¶ 18, 1 A.3d 445.

[¶9] Contrary to Ayotte's first contention that he lacked the capacity to give knowing consent, the court found that Ayotte agreed to some, but not all, of the suggested courses of medical evaluation and treatment at the hospital and then acted in accordance with those decisions, thereby demonstrating that he had, and was exercising, the capacity to make decisions knowingly.

[¶10] Regarding Ayotte's second argument—that his consent was not voluntary because he felt "pressured" into signing the consent as an inducement to see his girlfriend, who was injured in the crash—the court found that the officer testified credibly that she had reviewed with Ayotte both the form authorizing consent to draw blood and the form explaining the right to refuse the blood draw, and that he signed both forms freely and voluntarily. In the totality of these circumstances, the court did not err when it determined that Ayotte's consent to the blood draw was knowingly and voluntarily given.

B.      Prosecutorial Misconduct

[¶11]  The State's attorney made the following statement to the jury as part of the closing argument, which drew a timely objection that the court sustained.

> [W]hen I was asking [the State's witness] about some of the other things that weren't highlighted by [Ayotte's attorney] that were in that article, things about analyzing the saliva for alcohol content, things about analyzing sweat pads to determine alcohol content.  I asked [the State's witness], is that something that you do?  Is that something that the lab is involved with?  And it's not.  *It's outdated methodologies*.  Sweat pads, saliva samples.  *Those are outdated*.

(Emphasis added.)  Ayotte argues that this statement constitutes prosecutorial misconduct because it suggested to the jury, without supporting evidence, that the Dubowski article was, in fact, outdated.

[¶12]  We have often noted that, in addition to their adversarial role, prosecutors have a "special responsibility" to help ensure a fair trial, *State v. Dolloff*, 2012 ME 130, ¶ 41, 58 A.3d 1032, "because they have an obligation to ensure that justice is done, as opposed to merely ensuring that a conviction is secured," *State v. Young*, 2000 ME 144, ¶ 6, 755 A.2d 547.  When prosecutorial misconduct is alleged, we assess whether there was actual misconduct and, if so, whether the court's response was sufficient to remedy any resulting prejudice.  *Dolloff*, 2012 ME 130, ¶ 32, 58 A.3d 1032.

[¶13]   Allegations of prosecutorial misconduct must be viewed in the "overall context of the trial," particularly "when the prosecutor's statements are made in response to the theory, argument, or provocation" of the defense.  *Id.* ¶ 44.  A "mere . . . misstatement by a prosecutor at trial, or the occasional verbal misstep, will not necessarily constitute misconduct when viewed in the context of the proceedings."  *Id.*

[¶14]   In response to alleged misconduct, we have consistently accorded trial courts considerable discretion in whether to issue a curative instruction, *see State v. Marr*, 551 A.2d 456, 458-59 (Me. 1988), and the appropriateness of the curative instruction, *see Dolloff*, 2012 ME 130, ¶ 32, 58 A.3d 1032.  We have also held that, "unless there is prosecutorial bad faith or exceptionally prejudicial circumstances," curative instructions—whether issued immediately in response to an inappropriate comment or question or incorporated into the court's general jury instructions—are often sufficient to remedy any prejudice that may have arisen as a result of the prosecution's misstatement.  *State v. Winslow*, 2007 ME 124, ¶ 24, 930 A.2d 1080; *see Marr*, 551 A.2d at 458-59.

[¶15]   Here, the State did not commit prosecutorial misconduct when it referred to the sweat pads and saliva sample techniques described in the

Dubowski article as outdated, and it is not a close call. First, Ayotte mischaracterizes the nature of the State's reference. From the context, it is clear that the State was referring to two distinct *methodologies* mentioned in the article—methodologies not used in this case—not the underlying scientific or contemporary validity of the article itself, as Ayotte incorrectly claimed. Second, there was no arguable bad faith in this isolated utterance, nor did it create "exceptionally prejudicial circumstances." *Winslow*, 2007 ME 124, ¶ 19, 930 A.2d 1080 (quotation marks omitted). The prosecutor did not make a series of inappropriate statements, commit repeated errors, or inject prejudice into the trial, but rather briefly mentioned two techniques that were not used in this case—techniques that the evidence demonstrated had not been used in the State's lab in thirty years—to distinguish them from the RE technique that was employed by the State in this prosecution. *Cf. Dolloff*, 2012 ME 130, ¶¶ 54-58, 58 A.3d 1032. Although the court declined to give an immediate curative instruction—properly noting that doing so would have the effect of injecting evidence that the Dubowski article was, in fact, not outdated—the court did reference the closing arguments in its general instructions and informed the jury that "the attorneys' statements are not evidence" and that, to the extent the attorneys disagree about facts or an attorney has misstated or

overstated evidence, the jury's reasonable inferences and recollection should control its verdict.

[¶16]  The court's jury instructions were sufficient and appropriate under the circumstances because, in context, the prosecutor's closing statements to the jury did not misstate the evidence, demonstrate bad faith, or create any prejudice.

The entry is:

Judgment affirmed.

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Cade H. Ayotte

Maeghan Maloney, District Attorney, and Alisa Ross, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2016-2294
FOR CLERK REFERENCE ONLY