MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2022 ME 22
Docket:        Pen-21-271
Argued:        March 9, 2022
Decided:       April 5, 2022

Panel:         STANFILL, C.J., and MEAD, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.*

STATE OF MAINE

v.

BRENT CROTEAU

HUMPHREY, J.

[¶1]  The State of Maine appeals from an order of the trial court (Penobscot County, *Budd, J.*) suppressing the blood test results of Brent Croteau in the State's prosecution of Croteau for a charge of operating under the influence (Class D), 29-A M.R.S. § 2411(1-A)(A), (5) (2021).  The State contends that the court erred in concluding that the blood sample drawn from Croteau for testing was obtained without his voluntary consent.  We vacate the judgment and remand for the court to deny Croteau's motion to suppress.

---

\* Although Justice Gorman participated in the appeal, she retired before this opinion was certified.

## I. BACKGROUND

[¶2] The following facts are drawn from the court's findings of fact in its suppression order and its order amending those findings of fact. The findings are supported by competent evidence admitted at the suppression hearing. *See State v. Cooper*, 2017 ME 4, ¶¶ 2, 9, 153 A.3d 759.

[¶3] Brent Croteau was driving southbound on Interstate 95 near Carmel on the evening of February 14, 2020. His vehicle left the highway and came to rest in a ditch near the tree line, with the vehicle's taillights visible from the highway. An off-duty state trooper, who was not wearing a uniform, was driving by in his private vehicle and stopped to see if he could assist with the situation.

[¶4] The trooper found Croteau sitting on the embankment between the road and the tree line. The trooper identified himself as an off-duty state trooper. He asked Croteau if he was injured and if there had been other passengers in the vehicle. Croteau answered, "I don't know," to each question.

[¶5] The trooper asked what had happened, and Croteau asked, "[D]o you want me to be honest?" The trooper responded affirmatively, and Croteau said that he had taken a lot of his medications and wanted to kill himself.

Croteau listened to all questions posed to him, answered appropriately, and followed all instructions carefully.

[¶6]  The trooper contacted the police dispatch center and requested emergency services.  Croteau remained seated until an ambulance arrived, and the trooper helped him into the ambulance.

[¶7]  An on-duty state trooper in uniform soon arrived in a marked State Police cruiser.  That trooper observed straight tire tracks in the snow leading off the road to the trees.  A pill bottle was found in Croteau's car, which was consistent with Croteau's statement that he had ingested large amounts of his medications.

[¶8]  The on-duty trooper entered the ambulance briefly and then exited, and Croteau was taken to the hospital for treatment without any roadside sobriety testing.  The on-duty trooper then went to the hospital, where he interviewed Croteau and recorded their conversation.  That trooper identified himself as the investigating trooper and advised Croteau of his *Miranda*[1] rights.  The trooper spoke at a measured pace and took care to obtain "yes" responses to confirm Croteau's understanding of his rights.

---

[1]  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

[¶9]  Croteau agreed to speak with the trooper and explained coherently that he had taken a total of sixty pills between 7:00 and 9:00 p.m. and had then driven on the Interstate.  While the trooper and Croteau spoke, medical personnel were asking Croteau questions to determine his immediate physical health.  They were checking his vital signs and preparing him for an echocardiogram (EKG).  A nurse indicated that she was going to "steal a little bit more blood."

[¶10]  Hospital staff continued to communicate with Croteau about his medical care, and the trooper told Croteau that he had everything he needed for the time being, acknowledging that Croteau had "a lot going on with the hospital here."  The trooper said that he would call in a couple of days and told Croteau that he hoped he would feel better.

[¶11]  The trooper left momentarily but then returned to ask if Croteau would be willing to submit to a blood test to determine whether he had intoxicants in his system.  Specifically, the following exchange occurred:

> Trooper:  Hey Brent.  Just real quick.  Would you be willing to provide some blood for me?
>
> Croteau:  Sure.
>
> Trooper:  Okay.  So it would be—the reason for the blood draw would be—I'm looking for evidence of impairment.

Croteau:     I told you I was on my . . . medication.  So like—I have
             nothing to hide.

Trooper:     Okay.  All right.  So I'll get that paperwork and stuff, and
             I'll let the nurse know and we'll do that, okay?

Croteau:     Yup.  Cool.

About twenty minutes later, the trooper returned with a test kit, and Croteau signed a consent form for sample collection before his blood was drawn.  The trooper did not read the consent form to Croteau before Croteau signed it.

[¶12]  The trooper did not provide Croteau with a form explaining either his statutory duty to submit to testing or his option to refuse to submit to testing and bear the statutory consequences of refusal, which may include license suspension, admissibility of the refusal to consent to testing at a trial for operating under the influence, and sentencing consequences if convicted.[2] *See* 29-A M.R.S. § 2521(3) (2021).

---

[2] Specifically, the statute provides,

Neither a refusal to submit to a test nor a failure to complete a test may be used for any of the purposes specified in paragraph A, B or C unless the person has first been told that the refusal or failure will:

**A.** Result in suspension of that person's driver's license for a period up to 6 years;

**B.** Be admissible in evidence at a trial for operating under the influence of intoxicants; and

**C.** Be considered an aggravating factor at sentencing if the person is convicted of operating under the influence of intoxicants that, in addition to other

6

[¶13] On April 11, 2020, the State charged Croteau by criminal complaint with operating under the influence (Class D), 29-A M.R.S. § 2411(1-A)(A), (5). Croteau pleaded not guilty and moved to suppress the results of his blood test.[3] The court held an evidentiary hearing on the motion on July 16, 2021. The court received testimony from the off-duty and on-duty troopers and admitted in evidence the signed consent form for sample collection, the on-duty trooper's dashboard camera recording, and the on-duty trooper's recorded conversations with Croteau.

[¶14] The court granted the motion to suppress, reasoning that Croteau's blood was obtained through inadvertent misrepresentation because he was never advised of his right not to submit to the test. The court found that the trooper's request for a blood sample "was delivered in passing, almost as an 'oh by the way'-type afterthought," which did not allow Croteau time to consider and reflect on the request. The court found that Croteau was distracted by

---

penalties, will subject the person to a mandatory minimum period of incarceration.

29-A M.R.S. § 2521(3) (2021). The statute does not require the delivery of warnings for *test results* to be admitted; indeed, it provides that "[a] test result *may not* be excluded as evidence in a proceeding before an administrative officer or court solely as a result of the failure of the law enforcement officer to comply with the notice of subsection 3." *Id.* § 2521(4) (emphasis added).

[3] He also moved to suppress evidence of statements that he made to law enforcement, and the court granted that motion as to statements he made to the on-duty trooper at the scene of the accident while he was in the ambulance. This ruling is not at issue on appeal.

medical personnel and preparation for the EKG, had been told by a nurse that his blood was going to be drawn, and did not have time to reflect on his decision. The court concluded that the blood draw was a result of mere acquiescence to the trooper's authority.

[¶15]  The State moved for the court to amend its findings.  Croteau filed an "answer" to the State's motion in which he requested additional findings as well.  The court amended its findings to indicate that (1) the nurse stated that she was going to draw blood over a minute before the trooper requested another blood draw for chemical testing and (2) about twenty minutes passed between Croteau's oral consent and his signature of the consent form.

[¶16]  The court reaffirmed its ruling, emphasizing that Croteau did not know that he had the discretion to refuse a blood draw and that the evidence was insufficient to establish that Croteau had the capacity to make an informed decision, especially given that the officer had advised him that he was finished interacting with him and was leaving so that Croteau could receive medical attention.  The State obtained the approval of the Attorney General to take the interlocutory appeal and timely appealed from the court's decision. *See* 15 M.R.S. § 2115-A(1), (5) (2021); M.R. App. P. 2B(b)(1), 21(b).

## II. DISCUSSION

[¶17]  The State argues that the court's factual findings require the conclusion that Croteau voluntarily consented to have his blood drawn for testing because he voluntarily spoke with the trooper after being advised of his *Miranda* rights, orally assented to submit to testing, and signed a written consent form.  The State further argues that the court's conclusion that Croteau did not voluntarily consent to the blood draw is inconsistent with its conclusion that Croteau freely and voluntarily waived his *Miranda* rights.  Finally, according to the State, the trooper was not required to inform Croteau of the consequences of a refusal to submit to the test before obtaining his consent.

[¶18] Croteau argues that the court properly found that, in the totality of the circumstances, he did not voluntarily consent to the search.  He contends that, as a factual matter, he "was simply not of the mindset to provide voluntary consent to the blood draw."

### A.  Standard of Review

[¶19]  In reviewing a ruling on a motion to suppress, we "review factual findings for clear error and issues of law de novo."  *State v. Palmer*, 2018 ME 108, ¶ 8, 190 A.3d 1009; *Cooper*, 2017 ME 4, ¶ 9, 153 A.3d 759.  Thus, we "review a court's factual findings regarding whether consent was given for

clear error, and the ultimate question of whether an individual consented to the search de novo." *State v. Ayotte*, 2019 ME 61, ¶ 8, 207 A.3d 614. When a court has granted a motion to suppress based on findings of fact that are not disputed on appeal, the ultimate question of voluntary consent to the search is a legal issue that we review de novo. *See State v. Bennett-Roberson*, 2019 ME 49, ¶ 9, 206 A.3d 303; *State v. Hasenbank*, 425 A.2d 1330, 1332 (Me. 1981); *see also State v. Cefalo*, 396 A.2d 233, 239 (Me. 1979) (holding that when "the challenge is to the legal conclusions drawn from historical facts, the dispute between the parties is not so much over the elemental facts as over the constitutional significance to be attached to them" (quotation marks omitted)).

## B. Voluntary Consent as an Exception to the Warrant Requirement

[¶20] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[4] Drawing blood for chemical testing to search for evidence of a crime constitutes a search and seizure for the purpose of the Fourth Amendment. *Palmer*, 2018 ME 108, ¶ 9,

---

[4] The State does not base its argument on the Maine Constitution.

190 A.3d 1009. A blood draw for this purpose "therefore requires a warrant or the existence of an exception to the warrant requirement, such as consent." *Ayotte*, 2019 ME 61, ¶ 8, 207 A.3d 614.

[¶21] For the consent exception to the warrant requirement to apply, "[t]he State must prove by a preponderance of the evidence that consent was objectively manifested by word or gesture" and was freely and voluntarily given. *State v. Marquis*, 2018 ME 39, ¶ 17, 181 A.3d 684. Consent is not voluntarily given if the circumstances, in their totality, demonstrate that consent was "coerced, by explicit or implicit means, by implied threat or covert force or duress, or was induced by deceit, trickery, or misrepresentation." *State v. LeMeunier-Fitzgerald*, 2018 ME 85, ¶ 22, 188 A.3d 183 (quotation marks omitted), *cert. denied*, 139 S. Ct. 917 (2019).

[¶22] In determining whether consent was voluntarily given, courts examine all indicia of coercion, including an officer's failure to read statutory warnings about the decision to consent to testing, *State v. Stade*, 683 A.2d 164, 166 (Me. 1996), or to advise that refusal of consent is an option, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *United States v. Laine*, 270 F.3d 71, 75 (1st Cir. 2001).

[¶23]  Courts additionally consider whether a law enforcement officer obtained consent through misrepresentation.  *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (misrepresentation about having the legal right to conduct the search, with the purported consent constituting "no more than acquiescence to a claim of lawful authority"); *Stade*, 683 A.2d at 165-66 (false statement that a person can obtain a driver's license "for work purposes" even if convicted of OUI); *State v. Barlow*, 320 A.2d 895, 898-901 (Me. 1974) (misrepresentation about the officers' legal authority to search a vehicle without a warrant); *State v. Blackman*, 898 N.W.2d 774, 786-87 (Wis. 2017) (false indication that the person will suffer specified negative consequences if the person does not consent); *United States v. Boukater*, 409 F.2d 537, 539 (5th Cir. 1969) (concealment of identity as a law enforcement officer).

[¶24]  Courts consider conduct inaccurately suggesting that compliance is required, as when an officer declares the intention to search and relies on the person's acquiescence to the search, *Commonwealth v. Carr*, 936 N.E.2d 883, 890 (Mass. 2010), or simply conducts the search without asking for consent, *see State v. Boyd*, 2017 ME 36, ¶¶ 4, 15, 156 A.3d 748.  Other factors that may suggest coercion include the placement of the person in custody, especially if

12

under close restraint,[5] *see United States v. Duran*, 957 F.2d 499, 503 (7th Cir. 1992); the failure to deliver *Miranda* warnings, *cf. Boukater*, 409 F.2d at 539; a show of force or display of weaponry, *see United States v. Drayton*, 536 U.S. 194, 204 (2002); *Duran*, 957 F.2d at 503; and the refusal of necessary medical services if a person does not submit to a search of the blood for drugs, *see Ferguson v. City of Charleston*, 308 F.3d 380, 402-04 (4th Cir. 2002), *cert. denied*, 539 U.S. 928 (2003).

[¶25] Some factors weigh in favor of a finding of voluntary consent, however, such as the person's admission or confession, *see United States v. Scheiblauer*, 472 F.2d 297, 301 (9th Cir. 1973); *Boukater*, 409 F.2d at 539; the person's eagerness to explain what happened and to lead law enforcement to evidence, *see State v. Farmer*, 324 A.2d 739, 741, 744 (Me. 1974); the person's "active cooperation and assistance" with a search, *State v. Cress*, 576 A.2d 1366, 1367 (Me. 1990); *see State v. Sherburne*, 571 A.2d 1181, 1185 (Me. 1990); and the delivery of *Miranda* warnings to a person not in custody, *see Farmer*, 324 A.2d at 741, 744.

---

[5] *E.g.*, *United States v. Rothman*, 492 F.2d 1260, 1264-65 (9th Cir. 1973) (concluding that consent was not voluntary when the suspect had been "arrested, handcuffed, isolated in a strange place, given a formal *Miranda* warning and then interrogated by three officers over a period of approximately two hours").

[¶26]  We have stated that the State must demonstrate "that a person's consent was *knowingly* and voluntarily obtained."  *Ayotte*, 2019 ME 61, ¶ 8, 207 A.3d 614 (emphasis added).  Despite this description of a requirement that the consent be "knowingly . . . obtained," *id.*, it is not mandatory that the person have knowledge of the right to withhold consent, *see Schneckloth*, 412 U.S. at 248-49 ("[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."); *United States v. Collins*, 683 F.3d 697, 702 (6th Cir. 2012) (holding that, although a lack of awareness that consent can be refused is a factor for consideration, "police do not have to inform an individual of his right to refuse to consent to a search").  When a driver is "not informed that he might decline to take the test, this circumstance does not mandate a finding of lack of voluntariness."  *State v. Carter*, 443 A.2d 958, 960 (Me. 1982); *see also State v. Fitzherbert*, 361 A.2d 916, 920 (Me. 1976) ("[A] consent in fact given to a search is not vitiated in legal contemplation by the omission of the officer to inform the person giving the consent of his constitutional prerogative to refuse to consent.").

[¶27]  The requirement of *knowing* consent described in *Ayotte* therefore requires consideration of a person's *capacity* to give knowing consent rather

than consideration of whether the person was aware of the rights afforded by the Fourth Amendment. *See Ayotte*, 2019 ME 61, ¶ 9, 207 A.3d 614 ("Contrary to Ayotte's . . . contention that he lacked the *capacity to give knowing consent*, the court found that Ayotte agreed to some, but not all, of the suggested courses of medical evaluation and treatment at the hospital and then acted in accordance with those decisions, thereby demonstrating that he had, and was exercising, the capacity to make decisions knowingly." (emphasis added)); *see also United States v. Coombs*, 857 F.3d 439, 449 (1st Cir. 2017) (holding that "mental frailties" may bear on the validity of consent if there is "evidence of some nexus between . . . the individual's mental condition and the giving of consent or some evidence that officers obtained consent by exploiting a known vulnerability" (citation omitted)).

[¶28]  Thus, an individual's "physical and emotional condition," in addition to any other indicia of coercion or voluntariness, may be relevant to the court's analysis. *State v. Artic*, 786 N.W.2d 430, 445 (Wis. 2010). The existence of a medical condition does not necessarily render consent involuntary, however. *See State v. Glenn*, 2021 ME 7, ¶¶ 1, 29, 244 A.3d 1023 (affirming the court's findings and conclusion that a person with Autism Spectrum Disorder had the capacity to consent to a search based on the trial

court's consideration of the recording of the interview and an expert opinion offered on the issue of capacity).

## C.     Voluntary Consent to Blood Testing in Maine

[¶29]  We have reviewed trial court rulings on motions to suppress in which defendants challenged the admissibility of their blood test results. *See Ayotte*, 2019 ME 61, ¶¶ 8-10, 207 A.3d 614; *LeMeunier-Fitzgerald*, 2018 ME 85, ¶¶ 4, 32, 188 A.3d 183.  Most pertinent here, we affirmed a finding that consent was voluntary when, without any trickery or coercion, an officer asked if a driver would be willing to take a test without communicating the consequences of submitting to or refusing to submit to the test.  *State v. Brann*, 1999 ME 113, ¶¶ 4, 10-11, 736 A.2d 251.  In considering the due process issue raised there, we found no fundamental unfairness in following the legislative directive, still in force today, that "[a] test result may not be excluded as evidence in a proceeding before an administrative officer or court solely as a result of the failure of the law enforcement officer to comply with the notice of" the consequences of a refusal to submit to testing.  29-A M.R.S.A. § 2521(4); *see id.* § 2521(3); *Brann*, 1999 ME 113, ¶ 11, 736 A.2d 251.

[¶30]  We also addressed whether a person's consent was voluntary when the person *had* been warned, consistent with statutory law, that a refusal

to submit to testing could result in suspension of the person's driver's license for up to six years, would be admissible at a trial for operating under the influence, and could result in a mandatory minimum period of incarceration at sentencing if the person was ultimately convicted. *LeMeunier-Fitzgerald*, 2018 ME 85, ¶¶ 20, 24, 188 A.3d 183; *see* 29-A M.R.S. § 2521(3). We held that the delivery of warnings did not render the driver's consent involuntary and that "consent given in response to the Maine warnings does not represent mere acquiescence." *Id.* ¶ 31 (quotation marks omitted); *see also Ayotte*, 2019 ME 61, ¶ 10, 207 A.3d 614 (affirming a conclusion that the driver voluntarily consented after an officer provided the statutory warnings regarding the consequences of refusal). Here, unlike in *LeMeunier-Fitzgerald*, statutory warnings were *not* given, and the State challenges the court's conclusion that Croteau's consent was involuntary in these circumstances.

**D.     Review of the Trial Court's Ruling on the Motion to Suppress**

[¶31] In concluding that Croteau's consent was not voluntarily given, the court focused on three factors: (1) Croteau was distracted because of the medical personnel attending to his needs, (2) the officer said that he was done speaking with Croteau but then returned and requested the blood draw, and (3) Croteau was not informed of the option to refuse the test and the

consequences of refusal. We address each of these factors and then consider them as we analyze the totality of all circumstances.

### 1. Croteau's Medical Condition and Treatment

[¶32] Consent is not voluntarily given when a person is unconscious or severely impaired. *See, e.g.*, *Commonwealth v. Myers*, 164 A.3d 1162, 1181 (Pa. 2017) (holding that consent was not voluntarily given when the subject was unconscious); *Commonwealth v. Jones-Williams*, 237 A.3d 528, 542-43 (Pa. Super. Ct. 2020) (holding that consent was not voluntarily given when the subject was drifting in and out of consciousness), *appeal granted on other grounds*, 252 A.3d 1087 (Pa. 2021).

[¶33] Less significant medical issues and treatment, however, have been held not to impinge on the voluntariness of a person's consent. *See, e.g.*, *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003) (holding that consent was voluntarily given when the subject had received only a tetanus shot and Motrin for a knee injury and there was no evidence that the pain rendered his actions involuntary). Nor does the influence of intoxicating substances necessarily negate the voluntariness of consent. *See State v. Carter*, 443 A.2d 958, 960 (Me. 1982); *cf. State v. Kelly*, 376 A.2d 840, 849 (Me. 1977) (holding that, when waiver of constitutional rights is required, a person under the influence "is

legally competent to do so if, despite the degree of intoxication, he is aware and able to comprehend and to communicate with coherence and rationality" (quotation marks omitted)).

[¶34] Although the court found that Croteau was "distracted" by medical treatment requiring his attention and was not "provided any context in which to consider or even really to reflect on the request" for a blood draw, a person may have the capacity to consent despite such considerations. *See Ayotte*, 2019 ME 61, ¶ 9, 207 A.3d 614 (affirming a finding of capacity to consent to a blood draw when the subject "agreed to some, but not all, of the suggested courses of medical evaluation and treatment at the hospital and then acted in accordance with those decisions"). Nonetheless, the circumstances surrounding Croteau's consent are relevant in the totality of the circumstances to determine whether a coercive environment made it impossible for his consent to be freely and voluntarily given.

### 2. Timing of Request for a Blood Draw

[¶35] Although the court concluded that the trooper's casual return to the room to ask for a blood draw after having parted ways with Croteau amounted to misrepresentation, the facts found by the court reveal no factual or legal misrepresentation. Rather, the findings, supported by the interview

recording, make clear that Croteau was willing to submit to testing primarily because he had already, after validly waiving his *Miranda* rights, confessed to taking medications before driving. *See Garcia-Torres v. State*, 949 N.E.2d 1229, 1237 (Ind. 2011) (affirming a finding of voluntariness when the subject had already "told officers 'it was his fault' and said that he 'just want[ed] to tell the truth'").

### 3. Lack of Information About the Right to Refuse

[¶36] The remaining factor that the court emphasized in its analysis is the lack of any communication from the trooper that Croteau could refuse to submit to testing and the statutory consequences of such a decision. A lack of information about the right to refuse testing does not alone demonstrate involuntariness, though it may be considered in the totality of the circumstances. *See Schneckloth*, 412 U.S. at 248-49.

### 4. Totality of the Circumstances

[¶37] Reviewing the totality of the circumstances, we conclude that Croteau gave his consent voluntarily. Although the trooper did not advise Croteau of his right to refuse to submit to a blood test and requested the test as an afterthought while Croteau was being prepared for an EKG, Croteau's medical treatment was not conditioned on submission to testing; he had the

20

capacity to respond coherently to questions from law enforcement and hospital staff; he had been given *Miranda* warnings; he had already confessed to taking more than his prescribed amount of medication before driving; and the trooper did not convey false information, make a show of force, or state or imply that law enforcement had a right to draw the blood. In the absence of any express or implied misrepresentation that Croteau was required to submit to testing, Croteau's agreement to submit to testing cannot be considered a mere acquiescence to a claim of authority. Rather, his response to the trooper's request objectively manifested free and voluntary consent. *See Marquis*, 2018 ME 39, ¶ 17, 181 A.3d 684. Because the findings of the court, which it reached based on competent evidence in the record, do not support its legal conclusion, we vacate the judgment and remand for the court to deny the motion to suppress Croteau's blood test results.[6]

---

[6] Although Croteau argues that Maine's trial courts have suppressed evidence in similar circumstances, the cases he cites are not analogous. *See State v. Sherman*, No. CUMCD-CR-17-30124 Unified Criminal Docket (Cumberland Cnty., Feb. 2, 2018) (suppressing test results when law enforcement officers were unable to recall how the defendant expressed his consent to testing); *State v. West*, No. PENCD-CR-19-147 Unified Criminal Docket (Penobscot Cnty., May 29, 2019) (suppressing test results when, after multiple unsuccessful efforts to obtain a breath sample for testing, law enforcement incorrectly informed the defendant that he would automatically lose his license if he did not agree to go to the hospital for a blood test); *State v. Veilleux*, No. CUMCD-CR-16-812, 2016 Me. Super. LEXIS 190 (Aug. 8, 2016) (suppressing test results when (1) the defendant was under arrest; (2) the officer did not inform the defendant of the right to refuse testing; (2) the officer spoke of the test using mandatory terms, saying the test was "one of the steps [they] ha[d] to take"; and (3) the defendant merely acquiesced by saying, "let's get this done," and signing the consent form (quotation marks omitted)).

The entry is:

> Judgment vacated.  Remanded with instructions
> to deny the motion to suppress Croteau's blood
> test results.

---

Marianne Lynch, District Attorney, Danielle Pocock, Asst. Dist. Atty., and Lori Renzullo, Stud. Atty. (orally), Prosecutorial District V, Bangor, for appellant State of Maine

David J. Bobrow, Esq. (orally), Bedard and Bobrow, PC, Eliot, for appellee Brent Croteau

Penobscot Unified Criminal Docket docket number CR-2020-20206
FOR CLERK REFERENCE ONLY